2020 WL 911417
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

STATE of New York, State of Connecticut, State of
New Jersey, State of Washington, Commonwealth of
Massachusetts, Commonwealth of Virginia, State of
Rhode Island, City of New York, Plaintiffs-Appellees,
v.
United States DEPARTMENT OF JUSTICE, William
P. Barr, in his official capacity as Attorney General
of the United States, Defendants-Appellants.

Nos. 19-267(L); 19-275(con)
|
August Term 2018
|
Argued: June 18, 2019
|
Decided: February 26, 2020

**Synopsis**
**Background:** States and city brought action against Attorney
General and Department of Justice (DOJ) for declaratory,
injunctive, and mandamus relief, raising Administrative
Procedure Act (APA) and constitutional challenges to
immigration-related conditions for federal formula grants for
law enforcement activities under Edward Byrne Memorial
Justice Assistance Grant Program. The United States District
Court for the Southern District of New York, Edgardo Ramos,
J., 343 F.Supp.3d 213, granted partial summary judgment
to plaintiffs. Defendants appealed.

**Holdings:** The Court of Appeals, Raggi, Circuit Judge, held
that:

[1] compliance with federal laws identified by Attorney
General as being applicable to grant applicants was required;

[2] federal statute, prohibiting any government entity or
official from restricting the receipt, maintenance, or exchange
of information regarding citizenship or immigration status,
did not violate Tenth Amendment's anticommandeering
doctrine, as applied to certification condition for grants;

[3] notice condition concerning scheduled release dates for
detained aliens was "programmatic" information that could
be required from grant applicants;

[4] past-tense phrase in federal statute requiring coordination
with affected agencies did not preclude Attorney General
from requiring ongoing coordination;

[5] access condition concerning detained aliens was
authorized by statute; and

[6] DOJ did not act arbitrarily or capriciously in failing to
offer a document discussing the detrimental effects feared by
state and local governments.

Partial summary judgment reversed; mandate vacated;
remanded with directions.

**Procedural Posture(s):** On Appeal; Motion for Permanent
Injunction; Motion for Summary Judgment.

West Headnotes (29)

**[1]** **States**

⚖

While the Tenth Amendment reserves powers
to the States, the federal government maintains
broad and preeminent power in the realm of
immigration policy, which is codified in an
extensive and complex statutory scheme, and a
State may not pursue policies that undermine
federal immigration law. U.S. Const. Amend. 10;
Immigration and Nationality Act § 101 et seq.,
 8 U.S.C.A. § 1101 et seq.

**[2]** **States**

⚖

The States have no power, by taxation or
otherwise, to retard, impede, burden, or in
any manner control the operations of the
constitutional laws enacted by Congress to carry
into execution the powers vested in the general
government.

**[3]**     **Federal Courts**



The Court of Appeals reviews an award of summary judgment de novo, construing the record in the light most favorable to the non-moving party.

**[4]**     **Federal Courts**



The Court of Appeals will uphold an award of summary judgment only if there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law.

**[5]**     **Administrative Law and Procedure**



Except when acting pursuant to powers expressly conferred on the Executive Branch by the Constitution, an executive department or agency literally has no power to act unless and until Congress confers power upon it.

**[6]**     **Constitutional Law**



When the challenged action of a federal agency is not only unauthorized but also intrusive on power constitutionally committed to a coordinate branch, the action may violate the Constitution, specifically, its mandate for the separation of legislative from executive powers.

**[7]**     **Federal Courts**



Statutory text is construed by an appellate court de novo.

**[8]**     **United States**



Federal statute's use of word "including" in provision at conclusion of list of criminal-justice-related duties assigned to Assistant Attorney General (AAG), authorizing AAG to exercise "such other powers and functions" vested in AAG under the statutory chapter or by delegation of Attorney General, "including placing special conditions on all grants, and determining priority purposes for formula grants," signaled illustration rather than enlargement, and thus, the provision did not confer authority on Attorney General or AAG to place immigration-related conditions on federal formula grants, under Edward Byrne Memorial Justice Assistance Grant Program, to state and local governments for law enforcement activities.  8 U.S.C.A. § 1373; 34 U.S.C.A. §§ 10102(a)(6), 10153(a)(4), (a)(5)(C, D), 10155.

**[9]**     **Statutes**



Depending on context, the word "including" in a statute can be either illustrative or enlarging.

**[10]**     **United States**

Attorney General is vested with statutory authority to identify "applicable" federal laws, for purposes of statutory requirement that state and local governments, as applicants for federal formula grants for law enforcement activities under Edward Byrne Memorial Justice Assistance Grant Program, certify in a "form" acceptable to Attorney General that they will comply with all provisions of law pertaining to the program and all other "applicable Federal laws"; Attorney General's authority with respect to a "form" includes not only style but also the specificity of its content, i.e., whether certification is "acceptable" in a form that references "all other applicable Federal laws" generally, or whether such certification needs to be in a form that identifies specific applicable laws. 34 U.S.C.A. § 10153(a)(5)(D).

**[11]**     **United States**



Phrase "all other applicable Federal laws," for purposes of statutory requirement that state and local governments, as applicants for federal formula grants for law enforcement activities under Edward Byrne Memorial Justice Assistance Grant Program, certify in a form acceptable to Attorney General that they will comply with all provisions of law pertaining to the program and "all other applicable Federal laws," encompasses not only federal laws applicable to the grant, but also federal laws identified by the Attorney General as being applicable to the grant applicant, such as a federal law prohibiting any government entity or official from restricting the receipt, maintenance, or exchange of information regarding citizenship or immigration status as specified in that statute. 18 U.S.C.A. § 1373; 34 U.S.C.A. § 10153(a)(5)(D).

**[12]    Statutes**



A word in a statute that is not statutorily defined is properly construed according to its contemporary dictionary definition.

**[13]    Aliens, Immigration, and Citizenship**



Federal statute prohibiting any other federal statute from being construed to impose federal control over state and local criminal justice agencies did not prohibit Attorney General from construing a federal statute, prohibiting any government entity or official from restricting the receipt, maintenance, or exchange of information regarding citizenship or immigration status as specified in that statute, as being among "applicable Federal laws" for which certification of compliance could be required from state and local governments seeking federal formula grants for law enforcement activities under Edward Byrne Memorial Justice Assistance Grant Program; statute concerning citizenship and immigration status did not implicate federalization concerns, because it did not direct, control, or supervise day-to-day operations of any state or local police force or law enforcement agency, nor mandate that state or local law enforcement authorities cooperate with federal immigration officers, and instead required only that nothing be done to prohibit voluntary communication about citizenship or immigration status among officials.  8 U.S.C.A. § 1373; 34 U.S.C.A. §§ 10153(a)(5)(D), 10228.

**[14]    Statutes**



Subsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress, particularly where post-enactment proposals do not become law.

**[15]    Constitutional Law**



As-applied constitutional challenges are the basic building blocks of constitutional adjudication, and it is not the court's traditional institutional role to resolve questions of constitutionality with respect to each potential situation that might develop.

**[16]    States**



An anticommandeering principle derived from the Tenth Amendment prohibits the federal government from compelling the States to enact or administer a federal regulatory program. U.S. Const. Amend. 10.

**[17]    Federal Courts**



A panel decision of the Court of Appeals controls another panel unless and until reversed by the Court of Appeals en banc or by the Supreme Court.

**[18]    States**

An anticommandeering challenge to a federal statute depends on there being pertinent authority reserved to the States under the Tenth Amendment. U.S. Const. Amend. 10.

**[19]    Aliens, Immigration, and Citizenship**


While the federal government holds broad and preeminent power over immigration, that does not mean States can never enact any laws pertaining to aliens, but courts must carefully identify the powers reserved to States, under the Tenth Amendment, in this area of extensive and complex federal legislation, and carefully identify the effect of the States' exercise of their powers on federal immigration laws and policies. U.S. Const. Amend. 10.

**[20]    States**


While the Tenth Amendment's anticommandeering principle prohibits Congress from regulating the States, Congress's constitutional powers, notably under the Spending Clause, do allow Congress to fix the terms on which it shall disburse federal money to the States, and by setting such terms, Congress can influence a State's policy choices, and even implement federal policy it could not impose directly under its enumerated powers. U.S. Const. Amend. 10; U.S. Const. art. 1, § 8, cl. 1.

**[21]    States**


Where Congress, in exercising its spending power, places conditions on a State's receipt of federal funds, whether directly, or by delegation of clarifying authority to an executive agency, there is no commandeering of reserved State power under the Tenth Amendment, so long as the State has a legitimate choice whether to accept the federal conditions in exchange for federal funds. U.S. Const. Amend. 10; U.S. Const. art. 1, § 8, cl. 1.

**[22]    United States**


For federal grant conditions imposed on the States to be within the spending power of Congress, the conditions must: (1) promote the general welfare; (2) unambiguously inform States what is demanded of them; (3) reasonably relate to the federal interest in particular national projects or programs; and (4) not induce the States to engage in activities that would themselves be unconstitutional. U.S. Const. art. 1, § 8, cl. 1.

**[23]    States**


A State is deprived of legitimate choice, so that Congress, in exercising its spending power, violates the Tenth Amendment's anticommandeering principle by placing conditions on a State's receipt of federal funds, only when the federal government imposes grant conditions that pass the point at which pressure turns into compulsion. U.S. Const. art. 1, § 8, cl. 1; U.S. Const. Amend. 10.

**[24]    States**


Challenged federal statute, prohibiting any government entity or official from restricting the receipt, maintenance, or exchange of information regarding citizenship or immigration status as specified in that statute, did not violate Tenth Amendment's anticommandeering doctrine, as applied to requirement that state and local governments, as applicants for federal formula grants for law enforcement activities under Edward Byrne Memorial Justice Assistance Grant Program, certify that they would comply with applicable federal laws, including the challenged statute; loss of funding resulting from refusal to provide certification, e.g., less than 0.1% of a state's or a city's budget, would not represent a loss that in percentage terms would be so significant as to cross the line from pressure to

coercion. U.S. Const. Amend. 10;  8 U.S.C.A. § 1373; 34 U.S.C.A. § 10153(a)(5)(D).

some of whom inevitably would be aliens subject to removal. 34 U.S.C.A. §§ 10153(a)(5)(C), 10155.

**[25]    Aliens, Immigration, and Citizenship**

Notice condition for state and local governments seeking federal formula grants for law enforcement activities under Edward Byrne Memorial Justice Assistance Grant Program, requiring grant applicants to provide assurance that they would respond as early as practicable to written requests from federal immigration authorities for notice of identified aliens' scheduled release dates, was "programmatic," within meaning of grant program's statutory provision allowing Attorney General to require forms for assuring that grant applicants would maintain and report such "data, records, and information (programmatic and financial)" as Attorney General might reasonably require; inevitably, for grant-funded programs of state and local governments that related in any way to criminal prosecution, incarceration, or release of persons, some of those persons would be aliens subject to removal. 34 U.S.C.A. §§ 10153(a)(5)(C), 10155.

**[26]    Aliens, Immigration, and Citizenship**

Use of past-tense phrase "has been," in federal statutory requirement that state and local governments, as applicants for federal formula grants for law enforcement activities under Edward Byrne Memorial Justice Assistance Grant Program, certify in a form acceptable to Attorney General that there "has been appropriate coordination with affected agencies," did not preclude Attorney General from requiring as appropriate coordination that grant applicants, by time of grant application's filing, reach an agreement for a mutual relationship during grant period with Department of Homeland Security (DHS) as an agency affected by grant-funded programs of state and local governments that related to criminal prosecution, incarceration, or release of persons,

**[27]    Aliens, Immigration, and Citizenship**

Access condition for state and local governments applying for federal formula grants for law enforcement activities under Edward Byrne Memorial Justice Assistance Grant Program, requiring grant applicants to agree during grant period to ensure access by federal immigration officials to their correctional facilities so officials could meet with detained aliens to determine their immigration status, was authorized by federal statutory requirement that applicants certify in a form acceptable to Attorney General their appropriate coordination with affected agencies; Department of Homeland Security (DHS) would be affected by granted-funded programs related to prosecution, incarceration, or release of persons, some of whom inevitably would be removable aliens. 34 U.S.C.A. §§ 10153(a)(5)(C), 10155.

**[28]    Administrative Law and Procedure**

While agency action may be overturned as arbitrary and capricious if the agency entirely failed to consider an important aspect of the problem at issue, a court will not lightly reach that conclusion. 5 U.S.C.A. § 706(2)(A).

**[29]    United States**

Department of Justice (DOJ) did not act arbitrarily and capriciously in imposing immigration-related conditions for state and local governments seeking federal formula grants for law enforcement activities under Edward Byrne Memorial Justice Assistance Grant Program, though DOJ did not offer a document discussing the detrimental effects feared by state and local governments, such as undermining relationships between immigrant

communities and local law enforcement agencies; DOJ was aware of those concerns, and there was no need to discuss the relative detriments and benefits, because the sole question for DOJ concerning the certification condition was whether a federal statute prohibiting any government entity or official from restricting the receipt, maintenance, or exchange of information regarding citizenship or immigration status was among "applicable Federal laws," and because notice and access conditions concerning aliens in state or local custody would not be expected to dissuade law-abiding undocumented aliens who had been crime victims or witnesses from reporting crimes or cooperating in investigation of crimes. 🚩 8 U.S.C.A. § 1373; 34 U.S.C.A. §§ 10153(a)(4), (a)(5)(C), 10155; 📙 5 U.S.C.A. § 706(2)(A).

**West Codenotes**

**Negative Treatment Reconsidered**

🚩 8 U.S.C.A. § 1373(a, b).

On Appeal from the United States District Court for the Southern District of New York (Edgardo Ramos, *Judge*)

**Attorneys and Law Firms**

Brad Hinshelwood (Mark B. Stern, Daniel Tenny, on the brief) for Joseph H. Hunt, Assistant Attorney General, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C., for Defendants-Appellants.

Anisha S. Dasgupta, for Letitia James, Attorney General of the State of New York, New York, New York (Barbara D. Underwood, Eric R. Haren, Linda Fang, New York State Office of the Attorney General, New York, New York; Mark Francis Kohler, Michael Skold, for William Tong, Attorney General of the State of Connecticut, Hartford, Connecticut; Jeremy Feigenbaum, for Gurbir S. Grewal, Attorney General of the State of New Jersey, Trenton, New Jersey; Luke Alexander Eaton, for Robert W. Ferguson, Attorney General of the State of Washington, Olympia, Washington; David Urena for Maura Healey, Attorney General of the Commonwealth of Massachusetts, Boston, Massachusetts;

Victoria Pearson, for Mark R. Herring, Attorney General of the Commonwealth of Virginia, Richmond, Virginia; Michael W. Field, for Peter F. Neronha, Attorney General of the State of Rhode Island, Providence, Rhode Island, on the brief) for Plaintiffs-Appellees the States of New York, Connecticut, New Jersey, Washington, Rhode Island, and the Commonwealths of Massachusetts and Virginia.

Jamison Davies, Richard Dearing, Devin Slack, for Zachary W. Carter, Corporation Counsel of the City of New York, New York, New York for Plaintiff-Appellee the City of New York.

Adam Lurie, Caitlin Potratz Metcalf, Linklaters LLP, Washington, D.C., Counsel for Amicus Curiae American Jewish Committee.

Spencer E. Amdur, Lee Gelernt, Omar C. Jadwat, American Civil Liberties Union Foundation, New York, New York; Christopher Dunn, New York Civil Liberties Union, New York, New York; Mark Fleming, Heartland Alliance, Chicago, Illinois; Cody H. Wofsy, American Civil Liberties Union of California Immigrants' Rights Project, San Francisco, California; Counsel for Amici Curiae American Civil Liberties Union, New York Civil Liberties Union, National Immigrant Justice Center, National Immigration Law Center, Immigrant Legal Resource Center, Asian Americans Advancing Justice—Asian Law Caucus, Washington Defender Association, and the New Orleans Workers' Center for Racial Justice.

Before: Winter, Cabranes, and Raggi, Circuit Judges.

Reena Raggi, Circuit Judge:

## INTRODUCTION

**\*1** The principal legal question presented in this appeal is whether the federal government may deny grants of money to State and local governments that would be eligible for such awards but for their refusal to comply with three immigration-related conditions imposed by the Attorney General of the United States. These conditions require grant applicants to certify that they will (1) comply with federal law prohibiting any restrictions on the communication of citizenship and alien status information with federal immigration authorities, *see* 🚩 8 U.S.C. § 1373; (2) provide federal authorities, upon request, with the release dates of incarcerated illegal aliens; and (3) afford federal immigration officers access to incarcerated illegal aliens.

The case implicates several of the most divisive issues confronting our country and, consequently, filling daily news headlines: national immigration policy, the enforcement of immigration laws, the status of illegal aliens in this country, and the ability of States and localities to adopt policies on such matters contrary to, or at odds with, those of the federal government.

Intertwined with these issues is a foundational legal question: how, if at all, should federal, State, and local governments coordinate in carrying out the nation's immigration policy? There is also a corollary question: to what extent may States and localities seeking federal grant money to facilitate the enforcement of their own laws adopt policies to extricate themselves from, hinder, or even frustrate the enforcement of federal immigration laws?

At its core, this appeal presents questions of statutory construction. In proceedings below, the United States District Court for the Southern District of New York (Edgardo Ramos, *Judge*) determined that the Attorney General was not statutorily authorized to impose the challenged conditions and, therefore, enjoined their application. *See* New York v. Dep't of Justice, 343 F. Supp. 3d 213 (S.D.N.Y. 2018). The thoughtful opinion of the district court requires us to examine the authorization question in detail. For reasons explained in this opinion, we conclude that the plain language of the relevant statutes authorizes the Attorney General to impose the challenged conditions.

In concluding otherwise, the district court relied on, among other things, an opinion of the Seventh Circuit in City of Chicago v. Sessions, 888 F.3d 272 (7th Cir. 2018). While mindful of the respect owed to our sister circuits, we cannot agree that the federal government must be enjoined from imposing the challenged conditions on the federal grants here at issue. These conditions help the federal government enforce national immigration laws and policies supported by successive Democratic and Republican administrations. But more to the authorization point, they ensure that applicants satisfy particular statutory grant requirements imposed by Congress and subject to Attorney General oversight.

**[1]** **[2]** Nor can we agree with the district court that the challenged conditions impermissibly intrude on powers reserved to the States. See U.S. CONST. Amend. X. As the Supreme Court has repeatedly observed, in the realm of immigration policy, it is the federal government that maintains "broad," Arizona v. United States, 567 U.S. 387, 394, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012), and "preeminent," power, Toll v. Moreno, 458 U.S. 1, 10, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982), which is codified in an "extensive and complex" statutory scheme, Arizona v. United States, 567 U.S. at 395, 132 S.Ct. 2492. Thus, at the same time that the Supreme Court has acknowledged States' "understandable frustrations with the problems caused by illegal immigration," it has made clear that a "State may not pursue policies that undermine federal law." Id. at 416, 132 S.Ct. 2492. As Chief Justice John Marshall wrote over 200 years ago, "the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 436, 4 L.Ed. 579 (1819). This fundamental principle, a bedrock of our federalism, is no less applicable today. Indeed, it pertains with particular force when, as here, Congress acts pursuant to its power under the Spending Clause. *See* U.S. CONST. art. I, § 8.

## BACKGROUND

**\*2** Invoking this court's interlocutory jurisdiction pursuant to 28 U.S.C. § 1292(a)(1), defendants the United States Department of Justice and the Attorney General of the United States (hereinafter, collectively, "DOJ") appeal from an award of partial summary judgment entered on November 30, 2018. *See* New York v. Dep't of Justice, 343 F. Supp. 3d 213 (S.D.N.Y. 2018). That judgment grants plaintiffs, the States of New York, Connecticut, New Jersey, Rhode Island, and Washington, the Commonwealths of Massachusetts and Virginia (hereinafter, collectively, the "States"), and the City of New York (the "City"), injunctive relief from three immigration-related conditions imposed by DOJ on the receipt of 2017 Byrne Program Criminal Justice Assistance grants ("Byrne grants"). Those conditions required 2017 Byrne grant applicants (1) to certify their willingness to comply with 8 U.S.C. § 1373, which law precludes government entities and officials from prohibiting or restricting the sharing of citizenship or alien-status information with federal immigration authorities (the "Certification Condition"); (2) to provide assurance that,

upon written request of federal immigration authorities, grant recipients would provide notice of an incarcerated alien's scheduled release date (the "Notice Condition"); and (3) to certify that grant recipients would afford federal authorities access to State-incarcerated suspected aliens in order for those authorities to determine the aliens' right to remain in the United States (the "Access Condition"). [1] The district court's judgment not only enjoins DOJ from enforcing these three requirements as to any of plaintiffs' 2017 Byrne grants (which DOJ has otherwise awarded), but also mandates that DOJ release the withheld 2017 funds to plaintiffs without regard to the challenged conditions. *See id.* at 245–46; App. at 45 (modifying mandate).

Three of our sister circuits have now upheld injunctions precluding enforcement of some or all of the challenged conditions as to other jurisdictions applying for Byrne grants. *See City of Los Angeles v. Barr,* 941 F.3d 931 (9th Cir. 2019) (ruling as to Notice and Access Conditions); *City of Philadelphia v. Attorney Gen.,* 916 F.3d 276 (3d Cir. 2019) (ruling as to all three conditions); *City of Chicago v. Sessions,* 888 F.3d 272 (7th Cir. 2018) (ruling as to Notice and Access Conditions), *reh'g en banc granted in part, opinion vacated in part,* No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018) (vacating nation-wide injunction), *reh'g grant vacated,* No. 17-2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018). The district court relied on the Seventh Circuit decision in entering the challenged judgment, *see New York v. Dep't of Justice,* 343 F. Supp. 3d at 226–45; the later Third and Ninth Circuit decisions were not then available to it.

In urging reversal, DOJ argues that the district court erred in holding that the challenged conditions violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.,* and the Constitution. As to the APA, DOJ faults the district court for holding that (1) the Attorney General (and his designee, the Assistant Attorney General ("AAG")) lacked the requisite statutory authority to impose the challenged conditions; and (2) the conditions are, in any event, arbitrary and capricious because DOJ failed to consider their negative ramifications for applicants. As to the Constitution, DOJ argues that (1) the district court having found the conditions invalid under the APA, there was no need for it to consider their constitutionality; and (2) the challenged conditions do not raise either the separation-of-powers or Tenth Amendment concerns identified by the district court.

For reasons explained herein, we conclude that the challenged conditions do not violate either the APA or the Constitution. We therefore reverse the challenged judgment in favor of plaintiffs and remand the case to the district court for further proceedings consistent with this opinion.

## I. The Byrne Justice Assistance Grant Program

The Edward Byrne Memorial Justice Assistance Grant Program ("Byrne Program"), codified at 34 U.S.C. §§ 10151–10158, is the vehicle through which Congress annually provides more than $250 million in federal funding for State and local criminal justice efforts. [2] The Byrne Program was created in 2006 as part of the Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, § 1111, 119 Stat. 2960, 3094 (2006). That Act amended provisions of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. I, 82 Stat. 197, which itself had provided federal funding for State and local law enforcement initiatives.

**\*3** The Byrne Program is a formula grant program, *i.e.,* Congress appropriates a fixed amount of funding for the program and specifies "how the funds will be allocated among the eligible recipients, as well as the method by which an applicant must demonstrate its eligibility for that funding." Office of Justice Programs, *Grant Process Overview.* [3] The Byrne Program's statutory formula awards the States 50% of allocated funds based on their relative populations, *see* 34 U.S.C. § 10156(a)(1)(A), and the other 50% based on their relative rates of violent crime, *see id.* § 10156(a)(1) (B). The formula further provides that, of total Byrne funds awarded to a State, the State itself keeps 60%, with the remaining 40% percent allocated to local governments within the State. *See id.* § 10156(b).

Congress affords States and localities wide discretion in using Byrne grants. While awarded funds cannot substitute for a state's own expenditures, *see id.* § 10153(a)(1), Byrne grants may be used to support such diverse needs as "additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems," pertaining to a broad range of criminal justice initiatives:

> (A) Law enforcement programs. (B) Prosecution and court programs. (C)

Prevention and education programs. (D) Corrections and community corrections programs. (E) Drug treatment and enforcement programs. (F) Planning, evaluation, and technology improvement programs. (G) Crime victim and witness programs (other than compensation). (H) Mental health programs and related law enforcement and corrections programs, including behavioral programs and crisis intervention teams,

*id.* § 10152(a). As Congress has explained, its intent was thus to afford States and localities the "flexibility to spend money for programs that work for them rather than to impose a 'one-size fits all' solution." H.R. REP. NO. 109-233, at 89 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 1636, 1640.

Plaintiffs have received Byrne grants each year since that program's inception. They have used these grants for a variety of purposes, including, but not limited to, supporting various investigative task forces, funding both prosecutors' and public defenders' offices, paying 911 operators, improving their criminal records systems and forensic laboratories, identifying and mentoring criminally at-risk youth and young adults, operating drug courts and diversion programs for nonviolent felony offenders, mitigating gang violence in prison, and funding prisoner re-entry services.

While the Byrne fund-distribution formula is statutorily mandated, and while Byrne applicants can use such funds for almost any law-enforcement-related purpose, no State or locality is automatically entitled to receive a Byrne grant. Rather, a jurisdiction seeking Byrne funding must submit an application satisfying a host of statutory requirements. For example, a jurisdiction is statutorily required to make its Byrne Program application public and to afford an opportunity for public comment before submitting its final application to the Attorney General. *See* 34 U.S.C. § 10153(a) (3)(A)–(B). Also, a Byrne grant application must include a "comprehensive Statewide plan" detailing, as specified in § 10153(a)(6)(A)–(E), how awarded grants will be used to improve the jurisdiction's criminal justice system. A Byrne grant applicant must satisfy these, and all other statutory requirements, "in such form as the Attorney General may require," *id.* § 10153(a), and subject to such "rules" as the

Attorney General "shall issue" to carry out the program, *id.* § 10155. [4]

**\*4** Three statutory requirements for Byrne grants are particularly relevant to this appeal. *First*, an applicant must certify that it "will comply with all provisions of this part [*i.e.*, part of chapter pertaining to Byrne Program] and all other applicable Federal laws." *Id.* § 10153(a)(5)(D). *Second*, an applicant must provide assurance that it "shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require." *Id.* § 10153(a)(4). *Third*, an applicant must certify that "there has been appropriate coordination with affected agencies." *Id.* § 10153(a)(5)(C).

The Attorney General's authority to disapprove Byrne applications not satisfying the program's statutory requirements is implicit in the statutory provision tempering that authority with a required opportunity for correction: the Attorney General "shall not finally disapprove" a deficient application "without first affording the applicant reasonable notice of any deficiencies in the application and opportunity for correction and reconsideration." *Id.* § 10154. The authority to deny funds is further evident in Congress's instruction as to how appropriated funds are to be distributed if the Attorney General determines "that a State will be unable to qualify or receive [Byrne Program] funds": that State's allocation under the statutory formula "shall be awarded by the Attorney General to units of local government, or combinations thereof, within such State," giving priority to those with the highest reported number of violent crimes. *Id.* § 10156(f). Such denial authority is, moreover, consistent with the discretion Congress has afforded the Attorney General to waive certain statutory program requirements, *see id.* § 10152(c)(2), and to develop "guidelines" for the statutorily required "program assessment component" of every Byrne grant that is awarded, *id.* § 10152(c)(1).

The Attorney General is statutorily authorized to delegate the "powers and functions" thus vested in him by Title 34 to the AAG responsible for DOJ's Office of Justice Programs, which office now administers the Byrne Program. *Id.* § 10102(a)(6). Congress has made plain that the powers and functions that may be so delegated "includ[e] placing special conditions on all grants, and determining priority purposes for formula grants." *Id.*

## II. The Challenged Immigration-Related Conditions

In soliciting 2017 applications for Byrne Program grants, then-Attorney General Jefferson B. Sessions III, on July 25, 2017, announced the three immigration-related conditions at issue in this case.

*First*, the *Certification Condition* requires a Byrne grant applicant to execute a "Certification of Compliance with 8 U.S.C. § 1373." App. at 288, ¶¶ 52–53. That statute, which the Attorney General identified as an "applicable Federal law" for purposes of the certification requirement of 34 U.S.C. § 10153(a)(5)(D), *see supra* at ——, states, in pertinent part, as follows:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service[5] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

18 U.S.C. § 1373(a). The Certification Condition thus requires that,

> with respect to the "program or activity" funded in whole or part under this award (including any such "program or activity" of any subrecipient at any tier), throughout the period of performance for the award, no State or local government entity, -agency, or -official may prohibit or in any way restrict—(1) any government entity or -official from sending or receiving information regarding citizenship or immigration status as described in 8 U.S.C. § 1373(a); or (2) a government entity or -agency from sending, requesting or receiving, maintaining, or exchanging information regarding immigration

status as described in 8 U.S.C. § 1373(b).

**\*5** App. at 288–89, ¶¶ 52–53.

*Second*, the *Notice Condition* requires Byrne grant recipients to have in place throughout the grant period a law, rule, or policy for informing federal authorities, upon request, of the scheduled release date of an alien in the recipient's custody. It states that,

> as of the date the recipient accepts [a Byrne] award, and throughout the remainder of the period of performance for the award—
>
> ...
>
> A State statute, or a State rule, -regulation, -policy, or -practice, must be in place that is designed to ensure that, when a State (or State-contracted) correctional facility receives from DHS a formal written request authorized by the Immigration and Nationality Act that seeks advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and—as early as practicable ...—provide the requested notice to DHS.

*Id.* at 291, ¶ 55(1)(B).

*Finally*, the *Access Condition* requires grant recipients to have a law, rule, or policy in place allowing federal authorities to meet with incarcerated aliens in order to inquire about their rights to remain in the United States. It states that,

> as of the date the recipient accepts [a Byrne] award, and throughout the remainder of the period of performance for the award—
>
> ...
>
> A State statute, or a State rule, -regulation, -policy, or -practice, must be in place that is designed to ensure that agents of the United States acting under color of federal law ... are given ... access [to] any State (or State-contracted) correctional facility for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' rights to be or remain in the United States.

*Id.* at 291, ¶ 55(1)(A).

In announcing these conditions, Attorney General Sessions stated an intent to "increase information sharing between federal, state, and local law enforcement, ensuring that federal immigration authorities have the information they need to enforce immigration laws and keep our communities safe." Press Release, Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Programs (July 25, 2017). [6] The Attorney General was specifically critical of "[s]o-called 'sanctuary' policies [that] make all of us less safe because they intentionally undermine our laws and protect illegal aliens who have committed crimes." *Id.* He stated that DOJ needed to "encourage these 'sanctuary' jurisdictions to change their policies and partner with federal law enforcement to remove [alien] criminals." Thus, "[f]rom now on," DOJ would "only provide Byrne JAG grants to cities and states that comply with federal law, allow federal immigration access to detention facilities, and provide 48 hours['] notice before they release an illegal alien wanted by federal authorities." *Id.* [7]

## III. ⚑ Title 8 U.S.C. § 1373

**\*6** Because an understanding of how ⚑ 8 U.S.C. § 1373 became the focus of the Certification Condition is useful to a consideration of plaintiffs' challenge to that condition, we set forth that history here.

⚑ Section 1373 was enacted in 1996, when Congress took notice that certain states and localities were restricting their officials' cooperation with federal immigration authorities. *See generally* H.R. REP. NO. 104-725H.R. REP. NO. 104-725, at 391 (1996) (Conf. Rep.), *as reprinted in* 1996 U.S.C.C.A.N. 2649, 2779 (noting that various state statutes and local laws prevent disclosure of individuals' immigration status to federal officials). [8]

Members of the Senate Judiciary Committee voiced particular concern with granting federal funds to "State and local governments passing ordinances and rules which prohibit State and local agencies from cooperating or communicating with INS." *See The Impact of Immigration on the United States and Proposals to Reform U.S. Immigration Laws: Hearing Before the Subcomm. on Immigration and Refugee Affairs of the Comm. on the Judiciary*, 103d Cong. 45 (1994) [hereinafter *Immigration Reform Hearings*] (statement of Sen. Simpson, R. Wyo. ("I believe cooperation has to be [a] condition[ ] for any Federal reimbursement. In other words,

you are not going to get bucks from the Federal Government if the local governments can't communicate with the INS about illegal immigration and those who are involved in it.")); *see also id.* at 26 (statement of Sen. Feinstein, D. Cal. (signaling that she would not support providing immigration "impact aid" to "States and local governments that declined to cooperate in enforcement of [federal immigration] laws")); [9] *id.* (statement of Committee Chairman Sen. Kennedy, D. Mass. (acknowledging concerns of some mayors that cooperation with federal immigration authorities could be counterproductive to local law enforcement efforts, and observing that federal aid had to be provided "in ways that are going to get the[ir immigration] cooperation but also, ... [allow them] to deal with ... violence and gangs and drug problems and the rest. We are looking for balance ....")).

**\*7** In its report accompanying the proposed legislation that would become ⚑ § 1373, the Senate Judiciary Committee expressly recognized that the "acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act." S. REP. NO. 104-249, at 19–20 (1996) (quoted in 🔖 *City of New York v. United States*, 179 F.3d at 32–33). Thus, in enacting ⚑ § 1373, as in enacting ⚑ § 1644, Congress sought "to give State and local officials the authority to communicate with [federal immigration authorities] regarding the presence, whereabouts, or activities of illegal aliens," notwithstanding any local laws to the contrary. H.R. REP. NO. 104-725, at 383H.R. REP. NO. 104-725, at 383 (Conf. Rep.), *as reprinted in* 1996 U.S.C.C.A.N. at 2771 (quoted in 🔖 *City of New York v. United States*, 179 F.3d at 32).

In the twenty years that followed, political debates over federal immigration policies grew more contentious, and the number of State and local jurisdictions limiting official cooperation with federal immigration authorities increased. In February 2016, Representative John Culberson (R. Tex.), then the Chairman of the House Appropriations Subcommittee on Commerce, Justice, Science, and Related Agencies, forwarded to Attorney General Loretta E. Lynch a report by the Center for Immigration Studies, which concluded that "over 300 'sanctuary' jurisdictions [were] refus[ing] to comply with [federal immigration] detainers or [were] otherwise imped[ing] information sharing with

federal immigration officials." App. at 134. [10] Representative Culberson asked the Attorney General to investigate whether DOJ "grant recipients were complying with federal law, *particularly ...* 🚩 *§ 1373.*" *Id.* (emphasis added).

The ensuing investigation was conducted by DOJ's Inspector General ("IG") who, in May 2016, reported a significant, decade-long decline in state and local cooperation with federal immigration authorities. He reported that a 2007 congressionally mandated IG audit of seven jurisdictions then receiving federal funds pursuant to the State Criminal Alien Assistance Program ("SCAAP") revealed that all but one (San Francisco) were accepting federal detainers and providing federal authorities with timely notice of aliens' release dates. *See* App. at 134–35 n.1. By contrast, the IG's 2016 examination of ten jurisdictions receiving a combined 63% of relevant DOJ grants, [11] revealed that "all ... had ordinances or policies that placed limits on cooperation" with federal immigration authorities. *Id.; see id.* at 137, 145–49 (detailing limitations found). [12] The IG observed that insofar as these limitations "may be causing local officials to believe and apply the[se] policies in a manner that prohibits or restricts cooperation with [federal immigration officials] in all respects," that would be "inconsistent with and prohibited by 🚩 Section 1373." *Id.* at 141. Thus, "to the extent [DOJ]'s focus is on ensuring that grant applicants comply with 🚩 Section 1373," the IG stated that it could consider taking "several steps," including (1) clarifying that 🚩 § 1373 "is an 'applicable federal law' " that DOJ grant recipients "would be expected to comply with in order to satisfy relevant grant rules and regulations"; and (2) "[r]equir[ing] grant applicants to provide certifications specifying the applicants' compliance with 🚩 Section 1373, along with documentation sufficient to support the certification." *Id.* at 142.

**\*8** Following this IG report, in July 2016, DOJ, then still headed by Attorney General Lynch, specifically identified 🚩 § 1373 as "an applicable federal law" for purposes of both Byrne and SCAAP grants and began providing applicants and recipients with guidance as to the requirements of that statute. That guidance explained that 🚩 § 1373 imposed no affirmative obligation on States and localities but, rather, prohibited such entities from taking actions to restrict the exchange of immigration information with federal authorities. [13] For some jurisdictions identified by the

IG, notably plaintiff New York City, DOJ conditioned the continuance of their 2016 Byrne grants on the submission of documentation validating their compliance with 🚩 § 1373. [14]

In October 2016, DOJ published further guidance stating that henceforth, "all" Byrne grant applicants "must certify compliance with all applicable federal laws, including 🚩 Section 1373." App. at 182. Grant applicants were advised "to examine their policies and procedures to ensure they will be able to submit the required assurances" in their 2017 applications. *Id.* at 183.

Thus, when in July 2017, a new Attorney General, serving a new, Republican administration, announced that applicants for 2017 Byrne grants would have to certify their compliance with 🚩 § 1373, he was putting into effect the same condition earlier announced by DOJ under the preceding, Democratic administration.

### IV. Plaintiffs' 2017 Byrne Grant Awards
On June 26, 2018, DOJ applied the Byrne Program formula to award the plaintiff States Byrne grants totaling $25 million —subject to their acceptance of the three immigration-related conditions at issue. As to New York City, DOJ reiterated, in both October 2017 and January 2018, the concerns it had first expressed in 2016, *i.e.*, that certain of the City's laws or policies appeared to violate 🚩 § 1373, which could render it ineligible for Byrne grants. *See supra* at n.14.

**\*9** In response to these DOJ actions, the plaintiff States and City filed the instant related actions, challenging, *inter alia*, the Certification, Notice, and Access Conditions for 2017 Byrne grants as violative of both the APA and the Constitution.

### V. The Award of Summary Judgment to Plaintiffs
On the parties' cross motions for summary judgment, the district court granted partial judgment to plaintiffs, enjoining the enforcement of the challenged conditions as to them and mandating the release of 2017 Byrne grant funds to plaintiffs.

In so ruling, the district court held that the challenged conditions violated the APA in two respects: (1) the Attorney General lacked the statutory authority to impose

the conditions, *see* New York v. Dep't of Justice, 343 F. Supp. 3d at 227-31; and (2) defendants' failure to consider the conditions' potential negative ramifications for plaintiffs' law enforcement efforts rendered the conditions arbitrary and capricious, *see* id. at 238-41.

While the district court could have stopped there, it proceeded also to rule on certain of plaintiffs' constitutional challenges. As to § 1373 in particular, the district court ruled that DOJ could not identify it as an "applicable law" requiring compliance certification under 34 U.S.C. § 10153(a)(5)(D) because, on its face, § 1373 violates the anticommandeering principle of the Tenth Amendment to the Constitution. *See* id. at 231-37. Further, the district court concluded that, in the absence of statutory authority for the Attorney General to impose the challenged conditions, all three violated the separation of legislative and executive powers mandated by Articles I and II of the Constitution. *See* id. at 238.

Defendants timely appealed.

### DISCUSSION

[3]  [4]  We review an award of summary judgment *de novo*, construing the record in the light most favorable to the non-moving party. *See, e.g.*, Bentley v. AutoZoners, 935 F.3d 76, 85 (2d Cir. 2019). We will uphold such an award only if there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. *See* id.

### I. Statutory Authorization To Impose the Challenged Conditions

[5]  [6]  Except when acting pursuant to powers expressly conferred on the Executive Branch by the Constitution—which are not asserted here—an executive department or agency "literally has no power to act ... unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986). Thus, the APA requires that executive action taken in the absence of statutory authority be declared invalid. *See* 5 U.S.C. § 706(2)(C). [15] When the challenged action is not only unauthorized but also intrusive on power constitutionally committed to a coordinate branch, the action

may violate the Constitution, specifically, its mandate for the separation of legislative from executive powers. [16]

\*10  [7]  DOJ maintains that the Attorney General was statutorily authorized to impose each of the challenged conditions. Whether Congress conferred such authority depends on statutory text, which we construe *de novo*. *See* Kidd v. Thomson Reuters Corp., 925 F.3d 99, 103 (2d Cir. 2019); *United States v. Shyne*, 617 F.3d 103, 106 (2d Cir. 2010). [17]

### A. Title 34 U.S.C. § 10102(a)(6) Does Not Itself Authorize the Challenged Conditions

Because DOJ devotes considerable energy on this appeal, as it did in the district court, to arguing that the challenged conditions are authorized by 34 U.S.C. § 10102(a)(6), we explain at the outset why that argument does not persuade. We will then discuss sections of Title 34 that do authorize the conditions at issue.

At the conclusion of a list of criminal-justice-related duties assigned to the AAG, § 10102(a)(6) authorizes the AAG,

> [to] exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, *including placing special conditions on all grants, and determining priority purposes for formula grants.*

34 U.S.C. § 10102(a)(6) (emphasis added). Focusing on the highlighted language, DOJ argues that § 10102(a)(6) does not merely authorize the Attorney General to delegate powers and functions to the AAG, but also grants "addition[al]" authority, which supports the three challenged conditions. Appellant Br. at 22; *see* Reply Br. at 4–5.

In rejecting this argument, the district court held that the highlighted text is not a " 'stand-alone grant of authority to the Assistant Attorney General to attach any conditions to any grants.' " New York v. Dep't of Justice, 343 F. Supp. 3d

at 228 (quoting *City of Chicago v. Sessions,* 888 F.3d at 285). Rather, the introductory word "including" signals that the ensuing phrase is necessarily cabined by what went before it.

Thus, the Assistant Attorney General can only place special conditions or determine priority purposes to the extent that power already "may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General[,]" ... who may only delegate it to the extent that he has such power himself.

*Id.* (quoting 34 U.S.C. § 10102(a)(6)).

This conclusion finds support not only in *City of Chicago v. Sessions,* the Seventh Circuit decision quoted by the district court, but also in subsequent decisions of the Third and Ninth Circuits. *See* *City of Los Angeles v. Barr,* 941 F.3d at 938-39; *City of Philadelphia v. Attorney Gen.,* 916 F.3d at 287-89. We agree with that much of these courts' decisions.

**\*11** **[8]** **[9]** Depending on context, the word "including" can be either illustrative or enlarging. *Compare* *Federal Land Bank of St. Paul v. Bismarck Lumber Co.,* 314 U.S. 95, 100, 62 S.Ct. 1, 86 L.Ed. 65 (1941) (construing word as illustrative of preceding section), *with* *American Sur. Co. of N.Y. v. Marotta,* 287 U.S. 513, 517, 53 S.Ct. 260, 77 L.Ed. 466 (1933) (observing that, "[i]n definitive provisions of statutes," word frequently signifies extension rather than limitation), *and* *Adams v. Dole,* 927 F.2d 771, 776–77 (4th Cir. 1991) (noting dual meaning of word). The context here signals illustration rather than enlargement. It is the "other powers and functions" that may be vested in or delegated to the AAG that can "include" the authority to impose special conditions and to set priority purposes for Byrne Program grants. Thus, § 10102(a)(6) does not itself confer authority on the Attorney General (or AAG) to impose the conditions here at issue. The authority must originate in other provisions of law. That is the case here.

## B. Statutory Provisions Authorizing the Attorney General To Impose the Challenged Conditions

### 1. Other Circuits Identify No Such Authority

In looking to whether the Attorney General is otherwise authorized to impose the challenged conditions, we are mindful that three sister circuits have considered that question before us and concluded that he is not. Their reasons for so holding have not been uniform.

The Seventh Circuit so ruled with respect to the Notice and Access Conditions, reasoning that no provision of law outside § 10102(a)(6) specifically mentions "special conditions" or "priority purposes" for Byrne grants. *See* *City of Chicago v. Sessions,* 888 F.3d at 285.

The Ninth Circuit did not think that omission determinative. Reasoning that Congress could not have enacted § 10102(a)(6) "for the purpose of expressly authorizing the Assistant AG to exercise powers that do not exist," that court construed § 10102(a)(6) as effectively "confirming" what had been implicit in the overall statutory scheme, *i.e.*, that the Attorney General has the authority to impose special conditions on, and to identify priority purposes for, Byrne grants, which authority he can delegate to the AAG. *City of Los Angeles v. Barr,* 941 F.3d at 939. We agree with that much of the Ninth Circuit's reasoning. The court goes on, however, to construe the terms "special conditions" and "priority purposes" narrowly and, from that, concludes that the Attorney General is not statutorily authorized to impose the challenged Notice and Access Conditions. *See* *id.* at 939-41 (construing "special conditions" as used in § 10102(a)(6) to reference only "tailored requirements" necessary to particular circumstance "such as when a grantee is [at] 'high-risk' " of violating a grant's terms, not general conditions applicable to all grants); *id.* at 941-42 (limiting "priority purposes" for Byrne awards to purposes set out in § 10152(a)).

We cannot adopt the Seventh or Ninth Circuit's conclusions because we do not think the Attorney General's authority to impose the three challenged conditions here derives from the words "special conditions" or "priority purposes." Rather, we locate that authority in other provisions of law, specifically, those requiring Byrne grant applicants to satisfy the program's statutory requirements in such "form" and according to such "rules" as the Attorney General prescribes. *See* 34 U.S.C. §§ 10153(a), 10153(a)(5), 10155. Considering that form- and rule-making authority in light of three particular statutory requirements—(1) for certification of willingness to comply with "applicable Federal laws," *id.* § 10153(a)(5)(D); (2) for assurance that required information will be maintained and reported, *see id.* § 10153(a)(4); and

(3) for coordination with affected agencies, *see id.* § 10153(a)(5)(C)—we conclude that the Attorney General is statutorily authorized to impose the challenged conditions.

**\*12** Before explaining that conclusion, we acknowledge that the Third Circuit, considering these same three statutory requirements, held that none supports the challenged conditions. *See City of Philadelphia v. Attorney Gen.*, 916 F.3d at 285-91. The Third Circuit, however, viewed the Attorney General's statutory authority respecting Byrne Program grants as "exceptionally limited." *Id.* at 284-85. We do not.

The Third Circuit emphasized that the Byrne Program awards formula grants. *See id.* at 290. We agree that the Attorney General's authority to depart from that formula when awarding grants to *qualified* applicants is extremely limited. But before there can be an award, there must be a demonstrated showing of qualification. Repeatedly and throughout its pronouncement of Byrne Program statutory requirements, Congress makes clear that a grant applicant demonstrates qualification by satisfying statutory requirements in such form and according to such rules as the Attorney General establishes. This confers considerable authority on the Attorney General. [18]

To be sure, the Attorney General's authority in identifying qualified Byrne applicants is not limitless but, rather, a function of the particular requirements prescribed by Congress. Not surprisingly, however, Congress has prescribed those requirements broadly, enlisting the Attorney General to delineate the rules and forms for them to be satisfied. *See generally United States v. Haggar Apparel Co.*, 526 U.S. 380, 392-93, 119 S.Ct. 1392, 143 L.Ed.2d 480 (1999) (explaining that because "Congress need not, and likely cannot, anticipate all circumstances in which a general policy must be given specific effect[,]" agency may issue rules so that statute "may be applied ... in a manner consistent with Congress' general intent"). While the Attorney General certainly cannot exercise that authority arbitrarily or capriciously, *see infra* Point II, the authority itself cannot fairly be characterized as "exceptionally limited."

**\*13** With that understanding, we proceed to consider each challenged condition and the statutory provisions supporting it.

### 2. The Certification Condition Is Statutorily Authorized by 34 U.S.C. § 10153(a)(5)(D)

#### a. The Statutory Text Requires Applicants To Certify a Willingness To Comply With "All ... Applicable Federal Laws"

The Certification Condition requires a Byrne grant applicant to certify that, throughout the grant period, it will comply with 8 U.S.C. § 1373, the federal law prohibiting any government entity or official from restricting the receipt, maintenance, or exchange of information regarding citizenship or immigration status as specified in that statute. *See supra* at —— (quoting condition). The Attorney General's statutory authority to impose this condition derives from 34 U.S.C. § 10153(a)(5)(D). Therein, Congress specifically requires a Byrne grant applicant to include in its application "[a] certification, made in a form acceptable to the Attorney General" stating that "the applicant will comply with all provisions of this part *and all other applicable Federal laws.*" 34 U.S.C. § 10153(a)(5)(D) (emphasis added).

The conjunctive structure of § 10153(a)(5)(D) makes plain that a Byrne grant applicant must certify its willingness to comply with more than those provisions of law specifically pertaining to the Byrne Program ("this part"). It must also certify its willingness to comply with "all other applicable Federal laws." *Id.* At the same time that this phrase expands an applicant's certification obligation, the word "applicable," as used in the phrase, serves a limiting function. A Byrne applicant is not required to certify its willingness to comply with the United States Code in its entirety as well as all accompanying regulations. Rather, an applicant must certify its willingness to comply with those laws—beyond those expressly stated in Chapter 34—that can reasonably be deemed "applicable." This raises two questions: What is an "applicable" law? And who identifies it? We answer the second question first because it is not seriously disputed and, thus, requires only brief discussion.

#### 1. The Attorney General Is Authorized To Identify "Other Applicable Federal Laws" Requiring § 10153(a)(5)(D) Compliance Certification

**[10]** The statutory text signals that the Attorney General identifies the laws requiring § 10153(a)(5)(D) compliance

certification. This is evident in the requirement that Byrne grant applicants provide certification in a "form acceptable to the Attorney General." *Id.* § 10153(a)(5). A "form" is commonly understood to be a "document" for providing "required or requested specific information." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 892 (1986). By requiring that § 10153(a)(5)(D) certification be in a "form acceptable to the Attorney General," the statute makes clear that it is the Attorney General who has authority to "require[ ] or request[ ] specific information," to ensure a grant applicant's intended compliance with all other applicable federal laws. *See id.* Thus, § 10153(a)(5)(D) authorizes the Attorney General to decide not only the style (*e.g.*, format and typeface) for § 10153(a)(5)(D) certification, but also the specificity of its content, *i.e.*, whether certification is "acceptable" in a form that references "all other applicable Federal laws" generally, or whether such certification needs to be in a form that identifies specific applicable laws. [19]

**\*14** That Congress would vest such authority in the Attorney General makes sense for several reasons. First, while Congress itself requires compliance certification as to "all other applicable Federal laws," the number of laws that could apply to States and localities seeking Byrne funding is large, variable, and not easily identified in a single statutory provision. Second, the Attorney General, as the nation's chief federal law enforcement official, is particularly suited to identify the federal laws applicable to persons and circumstances. Third, having the Attorney General identify specific laws requiring § 10153(a)(5)(D) certification serves the salutary purpose of affording applicants clear notice of what is expected of them as Byrne grant recipients. [20]

### 2. "All Other Applicable Federal Laws" Encompasses Both Laws Applying To the Entity Seeking a Grant and Laws Applying To the Proposed Grant Program

**[11]** The district court nevertheless concluded that the Attorney General was not authorized to identify § 1373 as an applicable law. It held that " 'applicable Federal laws' for purposes of 34 U.S.C. § 10153(a)(5)(D) means federal laws applicable to the grant," not to the grant applicant. *New York v. Dep't of Justice*, 343 F. Supp. 3d at 230–31. Because it thought that § 1373 applies only to applicants in their capacities as State and local governments, not to their grants, the district court ruled that the statute

could not be an "applicable" law requiring § 10153(a)(5)(D) certification. *Id.* at 231. The Third Circuit subsequently reached the same conclusion. *See City of Philadelphia v. Attorney Gen.*, 916 F.3d at 288-90. In so ruling, both courts acknowledged that it would be reasonable to construe the statutory text to mean laws applicable to a grant applicant as well as to a requested grant. *See id.* at 288; *New York v. Dep't of Justice*, 343 F. Supp. 3d at 230-31. Nevertheless, the Third Circuit concluded that a narrower construction was required by the canon against surplusage, the structure of the statute, the historical practice of DOJ, and the formula-grant nature of the program. *See City of Philadelphia v. Attorney Gen.*, 916 F.3d at 289-91. The district court relied on similar reasoning, as well as Congress's obligation "unambiguously" to impose conditions on grants of federal money, to justify its narrow reading of § 10153(a)(5)(D). *New York v. Dep't of Justice*, 343 F. Supp. 3d at 231 (internal quotation marks omitted). We cannot agree.

**[12]** *First* and foremost, we do not think the statutory text admits such narrowing. *See generally Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (stating that "when the words of a statute are unambiguous ... judicial inquiry is complete" (internal quotation marks omitted)); *accord Mei Xing Yu v. Hasaki Rest., Inc.*, 944 F.3d 395, 403 (2d Cir. 2019) (citing *Connecticut Nat'l Bank v. Germain*). The word "applicable," as used in § 10153(a)(5)(D), is not statutorily defined. Thus, it is properly construed according to its contemporary dictionary definition, *see Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566, 132 S.Ct. 1997, 182 L.Ed.2d 903 (2012); *accord Munoz-Gonzalez v. D.L.C. Limousine Serv., Inc.*, 904 F.3d 208, 213 (2d Cir. 2018), which is "capable of being applied: having relevance," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 105. Statutes are "capable of being applied," and can be relevant both to persons and to circumstances. A second dictionary definition for the word "applicable"—"fit, suitable, or right to be applied," *id.*—only reinforces that conclusion, in that a statute may be fit, suitable, or right to apply both to persons and to circumstances. [21] Thus, an "applicable Federal law" under § 10153(a)(5)(D) is one pertaining either to the State or locality seeking a Byrne grant or to the grant being sought.

**\*15**  To the extent the district court might be understood to have construed "all other applicable laws" to mean only laws applying to States and localities as recipients of federal grants, nothing in the statutory text suggests that Congress there used the word "applicable" only in that limited sense. To the contrary, Congress's use of the adjective "all" to introduce the phrase "*all* other applicable Federal laws" signals an intent to give the word "applicable" its full effect, not to narrow it.

*See* Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n, 499 U.S. 117, 128–29, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991) (explaining that phrase "all other law" is "clear, broad, and unqualified" and "indicates no limitation" (internal quotation marks omitted)).

*Second*, we cannot agree with the Third Circuit that a redundancy or surplusage problem arises if "all other applicable Federal laws" is construed to mean laws pertaining both to Byrne applicants and to the grants they seek.

*See* City of Philadelphia v. Attorney Gen., 916 F.3d at 289 (concluding that such construction effectively equates phrase with "other Federal laws," making word "applicable" mere surplusage). As explained *supra* at ——, the word "applicable" does serve a limiting function in the statutory text—even if not as limiting as plaintiffs might wish. Thus, to raise a redundancy concern, the Third Circuit must imply that *if* Congress had used the phrase "all other Federal laws" in § 10153(a)(5)(D), then courts would have to infer the word "applicable" because of the improbability of Congress requiring certification for the entirety of federal law. But Congress did *not* use that broader phrase in § 10153(a)(5) (D). And we do not think its use of a modifying word —"applicable"—to make explicit in actual statutory text what our sister circuit thinks would have to be implied in a hypothetical alternative manifests surplusage. Rather, we think it demonstrates clear drafting.

*Third*, the formula nature of the Byrne Program does not warrant limiting the phrase "all other applicable Federal laws." While Congress's intent in appropriating funds for formula (as distinct from discretionary) grants is to have all the money distributed, even a formula grant applicant must satisfy the program's requirements before being entitled to receive funding. *Cf.* Richard B. Cappalli, *Rights and Remedies Under Federal Grants* 40 (1979) (remarking that states typically qualify for formula grants after submitting document statutorily described as "state plan," which serves as "vehicle by which the state commits itself to abide by the conditions which Congress attaches to the funds"). As

to the Byrne Program, this is evident from the fact that Congress has expressly provided for alternative distributions of appropriated funds if "a State will be unable to qualify" for a Byrne grant–a matter Congress also leaves for "the Attorney General [to] determine[ ]." 34 U.S.C. § 10156(f); *see supra* at ——. Thus, Byrne Program formula funding can be denied to an applicant that fails to provide the required § 10153(a) (5)(D) certification as to any "applicable Federal law[ ]," whether that law pertains to the particular grant sought or to the applicant seeking it. [22]

**\*16**  Indeed, whether a grant is awarded by formula or by discretion, there is something disquieting in the idea of States and localities seeking federal funds to enforce their own laws while themselves hampering the enforcement of federal laws, or worse, violating those laws. One has only to imagine millions of dollars in Byrne funding being sought by a locality that is simultaneously engaged in persistent, serious violations of federal environmental laws. The formula nature of the Byrne Program does not dictate that such an applicant must be given federal money even as it continues to flout federal law. To the contrary, § 10153(a)(5)(D) authorizes the Attorney General to condition the locality's receipt of a Byrne grant on its certified willingness to comply with *all* federal laws *applicable* to that locality, which includes environmental laws.

The conclusion obtains with even more force here, where enactment of the law at issue, 8 U.S.C. § 1373, was informed by Congress's concern that States and localities receiving federal grants were hampering the enforcement of federal immigration laws. *See supra* at —— – ——. Subsequent reports that increasing numbers of federal grant recipients were limiting cooperation with federal immigration authorities prompted a congressional request for DOJ investigation, the results of which led two successive Attorneys General serving different administrations to identify § 1373 as an "applicable Federal law" requiring compliance certification. *See supra* at —— – ——. [23] We are satisfied that these identifications are authorized by the plain language of § 10153(a)(5)(D), and the formula nature of the Byrne Program requires no contrary conclusion.

*Fourth*, the Third Circuit observes that certain § 10153(a) (5) certification requirements appear, on their face, to pertain to the requested grant rather than to the grant applicant. *See* City of Philadelphia v. Attorney Gen., 916 F.3d at

289 (citing § 10153(a)(5)(A) (requiring certification that "the programs to be funded by the grant meet all the requirements of this part"); § 10153(a)(5)(B) (requiring certification that "all the information contained in the application is correct"); and § 10153(a)(5)(C) (requiring certification that "there has been appropriate coordination with affected agencies")). That, however, is insufficient reason to impose a similar limitation on § 10153(a)(5)(D), when the plain language of that provision—"all other applicable Federal laws"—reaches more broadly. *See generally* *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. at 127, 129, 111 S.Ct. 1156 (rejecting argument that exemption from "antitrust laws *and from all* other law" was limited to antitrust-related laws; *ejusdem generis* canon does not apply where neither statutory text nor context supports urged limitation (emphasis added) (internal quotation marks omitted)).

**[13]** In urging otherwise, plaintiffs point to 34 U.S.C. § 10228, which states that "[n]othing in this chapter or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof." As the Fourth Circuit has observed in construing § 10228's predecessor statute, the provision is intended "to guard against any tendency towards federalization of local police and law enforcement agencies." *Ely v. Velde*, 451 F.2d 1130, 1136 (4th Cir. 1971) (construing statute to prohibit federal authorities from "[prescribing] the type of shoes and uniforms to be worn by local law enforcement officers, the type or brand of ammunition to be purchased and used by police departments and many other vital matters pertaining to the day-to-day operations of local law enforcement" (citation omitted)).

Section 1373 raises no such federalization concern. It does not direct, control, or supervise the day-to-day operations of any State or local police force or law enforcement agency. It does not mandate that State or local law enforcement authorities cooperate with federal immigration officers. It requires only that nothing be done to prohibit voluntary communication about citizenship or immigration status among such officials. *See supra* at ——. To hold that § 10228 places such a statutory requirement outside the scope of applicable laws requiring § 10153(a)(5)(D) compliance certification is to render that qualification condition a nullity, as compliance with every federal law necessarily places some limits on a grant applicant's actions. Indeed, that conclusion applies whether the law pertains to the applicant or the grant

program. We decline to construe § 10228 so broadly as to render § 10153(a)(5)(D) inoperative. *Cf. Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 250, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985) (noting "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative" (internal quotation marks omitted)). *See generally* *Ely v. Velde*, 451 F.2d at 1136 (declining to construe predecessor provision "so broadly as unnecessarily to undercut solutions adopted by Congress to preserve and protect other societal values"). [24]

***17** *Fifth*, DOJ's own focus on laws pertaining to grants rather than applicants in its past identifications of "applicable" federal laws does not itself limit the word. Given the scope of local programs that can be funded with Byrne grants, it is not surprising that DOJ would most frequently identify laws applicable to a particular program in specifying the form of an acceptable § 10153(a)(5)(D) certification.

*See generally* *City of Philadelphia v. Attorney Gen.*, 916 F.3d at 290 (observing that if requested grant was to be used for body armor purchases or human research, applicants were expected to certify willingness to comply with applicable federal regulations in those areas). Far fewer, one expects, will be the occasions when States and localities seeking Byrne grants are themselves violators of federal laws applicable to them. Nevertheless, in such circumstances, the violated laws fall within the plain meaning of the phrase "all other applicable Federal laws" as used in § 10153(a)(5)(D). To illustrate, while the Attorney General can—and has—required applicants proposing to use Byrne grants for construction or renovation projects to comply with federal environmental laws specifically applicable to such work, that hardly means he cannot also require an applicant that has a history of violating environmental laws generally from certifying its willingness going forward to comply with such laws. The laws are applicable in the former instance to the grant purpose; in the latter, to the grant applicant. In either case, the Attorney General is requiring compliance certification as to "applicable Federal laws."

*Sixth*, Congress's duty to speak unambiguously in imposing conditions on federal grant money also does not require "all other applicable Federal laws" to be construed to mean only laws pertaining to grants and not to grant applicants. *See New York v. Dep't of Justice*, 343 F. Supp. 3d at 231. The duty derives from *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694

(1981). The Supreme Court there analogized federal spending legislation to "a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Id.* at 17, 101 S.Ct. 1531. It concluded therefrom that Congress must "speak with a clear voice" in placing conditions on federal grants because there "can ... be no knowing acceptance [of the putative contract] if a State is unaware of the conditions or is unable to ascertain what is expected of it." *Id.*

"Knowing acceptance" is no concern here. Section 10153(a)(5)(D) provided plaintiffs with clear notice that their Byrne grant applications had to include a certification, in a form acceptable to the Attorney General, of their willingness to comply not only with laws specifically applicable to the Byrne Program, but also with "all other applicable Federal laws." To the extent the quoted phrase fails to specify precisely which laws are "applicable," that uncertainty can pertain as much for laws applicable to requested grants as for those applicable to grant applicants. Thus, the district court's *Pennhurst* reasoning does not support its conclusion that "applicable Federal laws" can pertain only to requested Byrne grants, not to grant applicants.

But more to the point, no *Pennhurst* concern arises here because plaintiffs were given advance notice that their 2017 Byrne grant applications had to certify a willingness to comply with § 1373. Indeed, they were given such notice twice, first in 2016, and again in 2017. *See supra* at —— – ——. To be sure, that notice was provided by DOJ rather than Congress. But the Supreme Court has recognized that, in establishing federal grant programs, Congress cannot always "prospectively resolve every possible ambiguity concerning particular applications of the [program's statutory] requirements." *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 666, 669, 105 S.Ct. 1544, 84 L.Ed.2d 590 (1985) (making point in context of federal education grant program). Thus, it has upheld an administering agency's clarifying interpretations, and even its violation determinations, as long they were grounded in "statutory provisions, regulations, and other guidelines provided by the Department" at the time of the grant. *Id.* at 670–71, 105 S.Ct. 1544; *see also United States v. O'Hagan*, 521 U.S. 642, 672-73, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997) (recognizing agency authority to prescribe legislative rules consistent with statute). Plaintiffs

here may disagree with the identification of § 1373 as an "applicable Federal law," but they can hardly complain of inadequate notice.

**[14]** In a final argument in support of their APA challenge to the Attorney General's identification of § 1373 as an applicable federal law, plaintiffs point to Congress's rejection of various legislative proposals to impose immigration-related conditions on receipt of federal funds. As the Supreme Court has cautioned, "subsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress." *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (internal quotation marks omitted). Such legislative history "is a particularly dangerous ground" of construction where, as here, the "proposal[s] ... do[ ] not become law." *Id.* Indeed, "several equally untenable inferences may be drawn from" congressional inaction, "including the inference that the existing legislation already incorporated the offered change." *Id.* (internal quotation marks omitted). Thus, this challenge to the Attorney General's § 10153(a)(5)(D) authority to identify § 1373 as an "applicable" law also fails.

***18*** In sum, we conclude that the plain language of § 10153(a)(5)(D), authorizes the Attorney General to require certification in a form that specifically references federal laws applicable either to the Byrne grant sought or to the State or locality seeking that grant. Because 8 U.S.C. § 1373 is a law applicable to all plaintiffs in this action, the Attorney General was authorized to impose the challenged Certification Condition and did not violate either the APA or separation of powers by doing so.

### b. Tenth Amendment Challenge

### (1) "As Applied" Review

The district court ruled not only that the Certification Condition *was not* statutorily authorized, but also that it *could not* be so authorized without violating the Constitution. Specifically, the district court held that 8 U.S.C. § 1373, the law for which the condition required certification, "is facially unconstitutional under the anticommandeering doctrine of the Tenth Amendment," and, as such, "drops out

Case: 3:19-cv-50311 Document #: 35-5 Filed: 03/03/20 Page 20 of 34 PageID #:461

of the possible pool of 'applicable federal laws' " requiring § 10153(a)(5)(D) certification. *New York v. Dep't of Justice, 343 F. Supp. 3d at 237* (internal quotation marks omitted). The district court did not have to reach this constitutional question, having already found the Certification Condition to violate the APA. *See Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988)* (noting that "longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them");

*accord Camreta v. Greene, 563 U.S. 692, 705, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011)*. This court, however, cannot avoid the issue in light of our ruling that the Certification Condition is statutorily authorized.

**[15]** For reasons briefly explained herein, we think the district court's reasoning insufficient to support its declaration of facial unconstitutionality. We do not pursue the matter in detail, however, because § 1373's constitutionality is properly assessed here not on the face of the statute, but as applied to clarify a federal funding requirement.[25] In that context, § 1373 does not constitute commandeering in violation of the Tenth Amendment.

**\*19** To the extent the district court thought that § 1373 had to be constitutional in all its applications to be identified as an "applicable Federal law[ ]" warranting § 10153(a)(5)(D) certification, it was mistaken. Even assuming *arguendo* that § 1373 can constitutionally be applied to States and localities only when they are seeking federal funding—a matter we do not here decide—the principle of severability would warrant upholding the statute as so narrowed. *See Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 685, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987)* (discussing severability in addressing constitutional challenges to statutes); *accord National Fed'n of Indep. Bus. ("NFIB") v. Sibelius, 567 U.S. 519, 586–88, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012)* (severing part of Affordable Care Act raising constitutional concerns and upholding remainder); *United States v. Booker, 543 U.S. 220, 245, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005)* (remedying constitutional defect in Sentencing Guidelines by severing provision for mandatory application). There can be no question that Congress would have enacted the law, even as so narrowed. Legislative history indicates

that § 1373's enactment was animated by reports that States and localities receiving federal funding were hindering cooperation with immigration authorities. *See supra* at ––––– –––––. Nor is there any reason to think that the law would not operate as Congress intended as applied in the funding context. *See generally Alaska Airlines, Inc. v. Brock, 480 U.S. at 684–85, 107 S.Ct. 1476* (discussing two factors informing severability).

With this understanding, that, in the end, the proper scope of constitutional inquiry is "as applied," we briefly discuss concerns raised by the district court's facial assessment before explaining our conclusion that § 1373 does not violate the Tenth Amendment as applied here to States and localities seeking Byrne Program grants.

## (2) The District Court's Identification of Facial Unconstitutionality

**[16]** The Tenth Amendment states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X. From this text, the Supreme Court has derived an "anticommandeering principle," which prohibits the federal government from compelling the States to enact or administer a federal regulatory program. *See Printz v. United States, 521 U.S. 898, 935, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997)* ("The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.").

This court has already considered, and rejected, a facial commandeering challenge to § 1373. *See City of New York v. United States, 179 F.3d 29 (2d Cir. 1999)*. We reasoned that § 1373 does not "compel[ ] state and local governments to enact or administer any federal regulatory program." *Id. at 35.* Nor does it "affirmatively conscript[ ] states, localities, or their employees into the federal government's service." *Id.* Rather, the law prohibits state and local governments and officials "only from

directly restricting the voluntary exchange of immigration information" with federal immigration authorities. *Id.*

[17]  The district court acknowledged this precedent, but concluded that it does not survive *Murphy v. National Collegiate Athletic Association,* —— U.S. ——, 138 S. Ct. 1461, 200 L.Ed.2d 854 (2018).[26] The Supreme Court there held that federal legislation prohibiting States from authorizing sports gambling violates the Tenth Amendment's anticommandeering rule because it "unequivocally dictates what a state legislature may and may not do." *Id.* at 1478. The Court explained that it did not matter whether Congress issued such a dictate by commanding affirmative action or imposing a prohibition: "The basic principle—that Congress cannot issue direct orders to state legislatures—applies in either event." *Id.* The district court concluded that *Murphy*'s reasoning required it to hold § 1373 facially violative of the Tenth Amendment because the statute's proscriptions prevent States from "adopting [immigration] policies contrary to those preferred by the federal government," or "extricating themselves from federal immigration enforcement." *New York v. Dep't of Justice,* 343 F. Supp. 3d at 235 (internal quotation marks and alterations omitted).

*20  *Murphy* may well have clarified that prohibitions as well as mandates can manifest impermissible commandeering. But the conclusion that § 1373, on its face, violates the Tenth Amendment does not follow.

[18]  A commandeering challenge to a federal statute depends on there being pertinent authority "reserved to the States." In *Murphy,* there was no question that, but for the challenged federal law, the States' police power allowed them to decide whether to permit sports gambling within their borders. That conclusion is not so obvious in the immigration context where it is the federal government that holds "broad," *Arizona v. United States,* 567 U.S. at 394, 132 S.Ct. 2492, and "preeminent" power, *Toll v. Moreno,* 458 U.S. at 10, 102 S.Ct. 2977. Title 8 of the United States Code, commonly known as the Immigration and Nationality Act ("INA"), *see* 8 U.S.C. § 1101 *et seq.,* is Congress's "extensive and

complex" codification of that power, *Arizona v. United States,* 567 U.S. at 395, 132 S.Ct. 2492.

[19]  This does not mean that States can never enact any laws pertaining to aliens. *See id.* at 404, 132 S.Ct. 2492 (observing that "[w]hen there was no comprehensive federal program regulating the employment of unauthorized aliens ... State had authority to pass its own laws on the subject"). But courts must carefully identify the powers reserved to States in this area of extensive and complex federal legislation and the effect of their exercise on federal immigration laws and policies. It is doubtful that States have reserved power to adopt—in the words of the district court—immigration policies "*contrary* to those preferred by the federal government." *New York v. Dep't of Justice,* 343 F. Supp. 3d at 235 (internal quotation marks omitted) (emphasis added). As Chief Justice Marshall famously pronounced, "The states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." *McCulloch v. Maryland,* 17 U.S. at 436. The Supreme Court recently made the same point in the immigration context. While acknowledging a State's "understandable frustrations with the problems caused by illegal immigration," the Court held that the "State may not pursue policies that undermine federal law." *Arizona v. United States,* 567 U.S. at 416, 132 S.Ct. 2492.

Here, the district court declared § 1373 facially violative of the Tenth Amendment without identifying what reserved power States have to enact laws or policies seemingly foreclosed by 8 U.S.C. § 1373, *i.e.,* laws prohibiting their officials and agencies from engaging in even voluntary communications about citizenship and immigration status with federal authorities. A court undertaking that inquiry would have to recognize, as the Supreme Court has, that "[c]onsultation between federal and state officials is an important feature of the immigration system" established by the INA. *Id.* at 411, 132 S.Ct. 2492. A court would then have to consider how various INA provisions establish that consultation feature. In *Arizona v. United States,* the Supreme Court discussed various INA provisions encouraging or prohibiting restrictions on federal-state sharing of immigration-status information before concluding

that the "federal scheme thus leaves room for a [State] policy *requiring* state officials to contact [federal immigration authorities] as a routine matter." *Id.* at 413, 132 S.Ct. 2492 (emphasis added). The same conclusion may not be so easy to reach, however, with respect to a State policy *prohibiting* information sharing. Among the statutes cited in *Arizona v. United States* to illustrate the importance placed on federal-state consultation by the INA is 8 U.S.C. § 1644. *See* 567 U.S. at 412–13, 132 S.Ct. 2492. As discussed *supra* at ___ – ___, § 1644, like § 1373, prohibits restricting State or local government entities from communicating with federal immigration authorities " 'regarding the immigration status, lawful or unlawful, of an alien in the United States.' " *Id.* (quoting 8 U.S.C. § 1644). Further, even outside the immigration context, the Supreme Court has not decided whether a federal law imposing "purely ministerial reporting requirements" on the States violates the Tenth Amendment. *See Printz v. United States*, 521 U.S. at 936, 117 S.Ct. 2365 (O'Connor, *J.*, concurring) (noting open question regarding statute's missing child reporting requirement).

**\*21** While this authority casts doubt on the district court's identification of *facial* unconstitutionality, we do not ourselves pursue the point further because, even assuming some power reserved for the States to prohibit information sharing with federal immigration authorities, we conclude that § 1373 does not violate the Tenth Amendment *as applied* here to a federal funding requirement.[27]

### (3) Section 1373 Raises No Commandeering Concerns as Applied to a Federal Funding Requirement

**[20]** **[21]** **[22]** While Congress cannot regulate the States, its constitutional powers, notably under the Spending Clause, *see* U.S. CONST. art. I, § 8, cl. 1, do allow it to "fix the terms on which it shall disburse federal money to the States," *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. at 17, 101 S.Ct. 1531. By setting such terms, Congress can "influenc[e] a State's policy choices," *New York v. United States*, 505 U.S. at 166, 112 S.Ct. 2408, and even "implement federal policy it could not impose directly under its enumerated powers," *NFIB v. Sibelius*,

567 U.S. at 578, 132 S.Ct. 2566; *see South Dakota v. Dole*, 483 U.S. 203, 207, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (explaining that "objectives not thought to be within Article I's enumerated legislative fields may nevertheless be attained through the use of the spending power and the conditional grant of federal funds" (internal quotation marks omitted)); *United States v. Butler*, 297 U.S. 1, 66, 56 S.Ct. 312, 80 L.Ed. 477 (1936) (holding that Congress's power to place conditions on disbursement of federal funds "is not limited by the direct grants of legislative power found in the Constitution"). Thus, where Congress places conditions on a State's receipt of federal funds—whether directly, or by delegation of clarifying authority to an executive agency— there is no commandeering of reserved State power so long as the State has "a legitimate choice whether to accept the federal conditions in exchange for federal funds." *NFIB v. Sibelius*, 567 U.S. at 578, 132 S.Ct. 2566.[28]

**\*22** **[23]** A State is deprived of "legitimate choice" only when the federal government imposes grant conditions that pass the point at which "pressure turns into compulsion." *Id.* at 577–78, 132 S.Ct. 2566 (internal quotation marks omitted). On this point, even the *NFIB* dissenters agreed. *See id.* at 681, 132 S.Ct. 2566 (Scalia, *J.*, with Kennedy, Thomas, and Alito, *JJ.*, dissenting) (observing that "courts should not conclude that legislation is unconstitutional ... unless the coercive nature of an offer is unmistakably clear"). Pressure can turn into compulsion when the amount of funding that a State would lose by not acceding to the federal conditions is so significant to the States' overall operations as to leave it with no real choice but to agree.

Such was the case with the Medicaid expansion provision of the Affordable Care Act, which the Supreme Court held invalid in *NFIB v. Sibelius* because it threatened States rejecting expansion with the withholding of 100% of their Medicaid funding, which constituted 10% to 16% of most States' total budgets. The Supreme Court concluded that "[t]he threatened loss of over 10 percent of a State's overall budget ... is economic dragooning that leaves the States with no real option but to acquiesce in the Medicaid expansion." *Id.* at 581–82, 132 S.Ct. 2566 (describing condition as "a gun to the head").

The funding loss associated with most grant conditions, however, does not raise such coercion concerns. *See id. at 684–85, 132 S.Ct. 2566* (Scalia, *J.*, with Kennedy, Thomas, and Alito, *JJ.*, dissenting) (observing that Medicaid expansion provision was "quite unlike anything that we have seen in a prior spending-power case" in that it "threatened to withhold 42.3% of all federal outlays to the States"). In *South Dakota v. Dole*, the Supreme Court described a threatened loss of 5% of federal highway funding—less than 0.5% of South Dakota's budget—if the state did not raise its legal drinking age to 21, as only "mild encouragement" and "a valid use of the spending power." 483 U.S. at 211–12, 107 S.Ct. 2793.

[24] This case is much more akin to *Dole* than to *NFIB*. While plaintiffs emphasize that a failure to provide § 10153(a)(5)(D) certification in a form acceptable to the Attorney General, *i.e.*, a form certifying a willingness to comply with 8 U.S.C. § 1373, can result in the denial of any Byrne funding for that year, plaintiffs do not—and cannot —claim that such a loss represents so significant a percentage of their annual budgets as to cross the line from pressure to coercion. For example, New York's anticipated 2017 Byrne award is $8,879,161, a significant amount of money to be sure, but one representing less than 0.1% of the State's annual $152.3 billion budget, a smaller percentage loss even than that in *Dole*. [29] Massachusetts' anticipated 2017 Byrne award is $3,453,006, also representing less than 0.1% of its annual $38.92 billion budget. [30] Thus, however much the plaintiff States would prefer to receive Byrne awards without having to certify their willingness to comply with 8 U.S.C. § 1373, they cannot complain that the consequences for failing to do so are so severe as to leave them with no real choice in the matter. As the Supreme Court has observed in connection with the conditions attached to most federal funding programs: "The States are separate and independent sovereigns. Sometimes they have to act like it." *NFIB v. Sebelius*, 567 U.S. at 579, 132 S.Ct. 2566.

*23 In sum, the district court erred in holding 8 U.S.C. § 1373 unconstitutional because the statute does not violate the anticommandeering principle of the Tenth Amendment as applied here to a federal funding requirement.

In the absence of any such Tenth Amendment concern, and in light of our holding that the challenged Certification

Condition is statutorily authorized by 34 U.S.C. § 10153(a)(5) (D), we conclude that the condition does not violate either the APA or the Constitution. Accordingly, we vacate the district court's injunction prohibiting application of the Certification Condition.

### 3. The Notice Condition Is Statutorily Authorized by 8 U.S.C. §§ 10153(a)(4), 10153(a)(5)(C), and 10155

The challenged Notice Condition requires States and localities accepting Byrne grants to have in effect during the grant period a "statute, or a state rule, -regulation, -policy, or -practice" for their criminal detention facilities to respond "as early as practicable" to written requests from federal immigration authorities for notice of identified aliens' scheduled release dates. *Supra* at —— – ——— (quoting condition). The Attorney General's statutory authority to impose this condition derives from 34 U.S.C. §§ 10153(a)(4), 10153(a)(5)(C), and 10155.

Section 10153(a)(4) requires a State or locality seeking Byrne funding to include in its application, "in such form as the Attorney General may require," "[a]n assurance" that throughout the grant period, "the applicant shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require." Section 10153(a)(5)(C) requires a Byrne grant applicant to provide "[a] certification, made in a form acceptable to the Attorney General," that "there has been appropriate coordination with affected agencies." Section 10155 authorizes the Attorney General to "issue rules to carry out" these requirements and any other parts of the Byrne Program.

The district court did not discuss these statutory conditions. It concluded simply that the Notice Condition was not authorized by § 10102(a)(6), as DOJ maintained. The Third Circuit, however, did consider §§ 10153(a)(4) and 10153(a)(5)(C). It concluded that § 10153(a)(4) did not authorize the Notice Condition because "[its] data-reporting requirement is expressly limited to 'programmatic and financial' information—*i.e.*, information regarding the handling of federal funds and the programs to which those funds are directed. It does not cover Department priorities unrelated to the grant program." *City of Philadelphia v. Attorney Gen.*, 916 F.3d at 285. As for § 10153(a)(5)(C), the Third Circuit concluded that it did not authorize the Notice Condition because its "coordination requirement" operated

only in the past tense, *i.e.,* "to require certification that there *was* appropriate coordination in connection with the grantee's application. This does not serve as a basis to impose an *ongoing* requirement to coordinate on matters unrelated to the use of grant funds." *Id.* (emphases in original).

To explain why we conclude otherwise, we discuss each statutory requirement in turn.

#### a. **Section 10153(a)(4)**'s Reporting Requirement

**[25]** The plain language of § 10153(a)(4) authorizes the Attorney General to decide both what data, records, and information a Byrne grant recipient must maintain and report and the form of an applicant's assurance that it will do so. This authority is cabined only by the parenthetical modifier "(programmatic and financial)," which serves to limit the referenced data, records, and information to those pertaining to the particular program being funded by a Byrne grant or to related financial matters. In this respect, at least, we agree with the Third Circuit. *See id.*

**\*24** But unlike that court, we think the release information required by the Notice Condition is "programmatic," at least for Byrne-funded programs that relate in any way to the criminal prosecution, incarceration, or release of persons, some of whom will inevitably be aliens subject to removal.[31] This includes most, if not all, of the programs for which plaintiffs seek Byrne funding, for example, (1) programs for task forces targeting certain crimes, the object of which is undoubtedly the arrest, prosecution, and eventual incarceration of perpetrators; (2) programs for prosecutors' offices, whose attorneys decide when to pursue (or forego) the prosecution and incarceration of criminal suspects; (3) programs for defenders' offices, whose attorneys work to secure persons' release from criminal detention and to avoid their conviction and incarceration; (4) diversion programs for persons who might otherwise remain in criminal custody; (5) programs for persons while incarcerated or for the facilities maintaining them; (6) programs for persons upon their release from incarceration. As to such programs, we conclude that the Attorney General is statutorily authorized by 8 U.S.C. § 10153(a)(4) to require Byrne grant recipients to report when identified aliens in their custody will be released.[32]

Insofar as the Notice Condition specifically requires a grant applicant to have a statute, rule, regulation, policy, or practice

in place for its criminal detention facilities to report identified aliens' release dates "as early as practicable" after receipt of a written federal request, we are satisfied that the requirement falls within the Attorney General's authority to determine the "form" of an acceptable Byrne grant application, which necessarily includes the form of an acceptable assurance. 34 U.S.C. § 10153(a). That conclusion is reinforced by the Attorney General's authority to "issue rules to carry out this part." *Id.* § 10155. *See generally Federal Election Campaign Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 37, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981) ("[D]eference should be presumptively afforded" to agency authorized to make rules in administering statute.); *National Broad. Co. v. United States,* 319 U.S. 190, 215, 219, 63 S.Ct. 997, 87 L.Ed. 1344 (1943) (explaining that statute delegating authority, *inter alia,* to "[m]ake such rules and regulations ... as may be necessary to carry out the provisions of this Act" gave agency "expansive powers" (internal quotation marks omitted)).

#### b. **Section 10153(a)(5)(C)**'s Coordination Requirement

**[26]** Further statutory authority for the Notice Condition is supplied by § 10153(a)(5)(C)'s requirement for certification, in "a form acceptable to the Attorney General," that "there has been appropriate coordination with affected agencies." The Third Circuit observed that Congress's use of the past tense in the quoted text signals that "appropriate coordination" must have occurred by the time a State or locality formally files its Byrne Program application. *See City of Philadelphia v. Attorney Gen.,* 916 F.3d at 285. While we agree with that construction, we do not think that means the required coordination need not continue into the future. *See id.* Rather, we think *appropriate* coordination frequently, perhaps invariably, must determine future conduct.

The plain meaning of "coordination" is "the functioning of parts in cooperation and normal sequence." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 502. "Coordination" strives to bring a "combination [of parts] in suitable relation for most effective or harmonious results." *Id.* The definition does not describe a static concept that ends as soon as the suitable relation of parts and sequence of their operation is determined. Rather, coordination contemplates that relation and sequence are agreed upon in order to

establish how parts will operate going forward to achieve effective and harmonious results.

**\*25** The "parts" pertinent to § 10153(a)(5)(C)'s coordination requirement are the grant applicant and the agencies that will be affected by that grant. Thus, the certification required by § 10153(a)(5)(C) demands that, in advance of any Byrne award, States and localities coordinate with affected agencies to determine their relationship and sequence of conduct as necessary throughout the grant period to ensure effective and harmonious results.

Put more concretely, if a State were to seek Byrne Program funding for its State police to pursue a law enforcement initiative involving undercover operations across several municipalities, "appropriate coordination" might well require the State to reach an understanding with the affected localities as to how notice will be given to them when those undercover activities are occurring within their borders, thus ensuring that local authorities do not misidentify the State undercover officers as real criminals, with possibly tragic consequences for both sides. In sum, the parties reach an understanding about necessary coordination before the State files its formal Byrne grant application, and the parties' conduct during the funding period is coordinated as thus agreed upon.

Similarly, were a State or locality to seek a Byrne grant to modernize equipment used to track terrorist threats, "appropriate coordination" might require the applicant to consult with other state and federal agencies engaged in similar tracking and to reach agreement as to the type of compatible equipment to be acquired and how obtained information will be shared and secured. Such coordination *before* formal application then determines the parties' conduct *after* receipt of the grant.

So, here, when a State seeks Byrne funding for programs that relate to the prosecution, incarceration, or release of persons, some of whom will be removable aliens, there must be coordination with the affected federal agency, the Department of Homeland Security ("DHS"), before a formal application is filed, but what makes that coordination "appropriate" is that it will establish the parties' relationship and the sequence of their conduct throughout the grant period.

To explain what makes DHS an affected agency, we begin with the ordinary and clear meaning of "affect," which is to "produce a material influence upon." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 35; *see* BLACK'S

LAW DICTIONARY (9th ed. 2009) (defining "affect" to mean "to produce an effect on; to influence in some way"). The degree of influence need not be significant for the law to recognize that something has been "affected" in a range of contexts. *See, e.g.*, *Jones v. United States*, 529 U.S. 848, 854, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000) (holding that "statutory term 'affecting ... commerce,' ... when unqualified, signal[s] Congress' intent to invoke its full authority under the Commerce Clause"); *United States v. Wiant*, 314 F.3d 826, 830 (6th Cir. 2003) (holding, in context of "affected a financial institution" that "breadth of [its] definition indicates that" word "affect" "is intended to encompass even minimal impacts"); *United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 90 (2d Cir. 1999) ("The sum of what dictionaries say about the relevant meaning is that the verb 'to affect' expresses a broad and open-ended range of influences.").

When States use Byrne grants in ways related to the prosecution, incarceration, or release of aliens, the DHS Secretary's performance of numerous statutory responsibilities with respect to such aliens is affected. For example, the Secretary must "begin any removal proceeding" for an alien convicted of a deportable offense "as expeditiously as possible after the date of the conviction," 8 U.S.C. § 1229(d)(1); must effect the removal of such an alien "within ... 90 days" after an order of removal becomes final, *see id.* § 1231(a)(1)(A)–(a)(1)(B)(i)–(ii); and must detain the alien during that 90-day period, *see id.* § 1231(a)(2). [33] The Secretary, however, "may not remove an alien who is sentenced to imprisonment"—whether by federal or State authorities—"until the alien is released." *Id.* § 1231(a)(4)(A). In that case, the 90-day removal period starts to run from the date of the alien's release from custody. *See id.* § 1231(a)(1)(B)(iii). [34] Moreover, in circumstances where a removable alien is released from custody before a final removal order has been obtained, the law authorizes the Secretary to issue a warrant for the alien's arrest and detention, *see id.* § 1226(a), and (with limited exceptions) requires the Secretary to do so if the alien has a certain criminal history or has engaged in terrorist activities, *see id.* § 1226(c)(1), (2). [35]

**\*26** As even this brief review makes plain, a removable alien's State incarceration and release from incarceration will affect DHS's performance of its own statutory duties throughout the grant period. In these circumstances, "appropriate coordination" requires that, by the time a State or locality files its Byrne grant application, it have reached

an agreement with DHS as to their mutual relationship and sequence of conduct throughout the grant period. Any less coordination would not be "appropriate"; indeed, it would be meaningless.

The Notice Condition serves to ensure such appropriate coordination. It advises States that, at the time they file a Byrne grant application, they must agree to respond as soon as practicable to a written DHS request for the release date of an identified State-incarcerated alien and to have a statute, rule, or policy in force throughout the grant period.

We conclude that the Attorney General is authorized to impose such a condition by § 10153(a)(5)(C), which empowers him to determine the acceptable form for certifying appropriate coordination. *See supra* at —— (discussing dictionary definition of "form" as something requiring "specific information"). [36] It is further supported by § 10155, which authorizes the Attorney General to issue rules for carrying out Byrne Program requirements. Of course, we recognize that plaintiffs would prefer not to coordinate *at all* with DHS, but that option is denied to them by § 10153(a)(5)(C) when the States seek Byrne grants for programs relating to prosecution, incarceration, or release that will affect DHS's performance of its own statutory duties.

In sum, we conclude that the Notice Condition is statutorily authorized by § 10153(a)(4)'s reporting requirement, § 10153(a)(5)(C)'s coordination requirement, and § 10155's rule-making authority for Byrne Program applications relating to prosecution, incarceration, and release. That being the purpose for which plaintiffs have generally sought Byrne funding, we vacate the district court's injunction barring any application of the Notice Condition.

### 4. The Access Condition Is Statutorily Authorized by 34 U.S.C. §§ 10153(a)(5)(C) and 10155

**[27]** Title 34 U.S.C. § 10153(a)(5)(C)'s coordination requirement and § 10155's rule-making provision also authorize the challenged Access Condition, and for much the same reason that they authorize the challenged Notice Condition. The Access Condition requires Byrne grant applicants to agree to have in place throughout the grant period a "statute, or a State rule, -regulation -policy, or -practice" that ensures federal immigration officials "access" to State correctional facilities so that these officials can meet with detained aliens (or suspected aliens) to determine

their legal status in this country. *See supra* at —— (quoting condition).

As explained in discussing the Notice Condition, when States seek Byrne funding for programs related to the prosecution, incarceration, or release of persons, some of whom will inevitably be removable aliens, DHS is an "affected agency" for purposes of 34 U.S.C. § 10153(a)(5)(C). That is because a State's incarceration of an alien requires DHS to delay acting on its own statutory obligations to arrest, detain, and remove certain aliens until the State releases the alien. *See supra* at ——–——. In such circumstances, coordination between the State and DHS is not only appropriate, but necessary, to allow the federal agency effectively to resume its obligations when the State has achieved its penal ones.

**\*27** For DHS to be able to do so, it needs to ascertain not only when a removable alien will be released (the object of the Notice Condition), but also what aliens incarcerated by the State are removable. DHS does not ask the State to provide the latter information. Rather, it asks to be afforded access to State-incarcerated aliens (or suspected aliens) so that DHS can itself ascertain their potential removability before release. That is what the challenged Access Condition ensures. [37]

Affording such access constitutes "appropriate coordination" in that it allows both the State seeking a Byrne grant for purposes relating to prosecution, incarceration, or release and an affected agency, DHS, to carry out their respective duties with respect to incarcerated aliens in an orderly sequence. Thus, as with the Notice Condition, we conclude that the Attorney General is statutorily authorized to impose the Access Condition pursuant to § 10153(a)(5)(C), which empowers him to determine the acceptable form for certifying appropriate coordination, and § 10155, which authorizes him to issue rules to carry out the coordination requirement. Accordingly, we vacate the injunction prohibiting any application of the Access Condition.

### II. The Attorney General's Imposition of the Challenged Conditions Was Not Arbitrary and Capricious

Plaintiffs argue that, even if the Attorney General was statutorily authorized to impose the challenged conditions, the district court correctly concluded that it was arbitrary and capricious for him to do so here without considering the conditions' negative consequences, particularly in undermining relationships between immigrant communities

and local law enforcement. *See* New York v. Dep't of Justice, 343 F. Supp. 3d at 240–41. The conclusion does not withstand *de novo* review. *See* Karpova v. Snow, 497 F.3d 262, 267 (2d Cir. 2007) (holding that appeals court reviewing summary judgment award on APA claim examines "administrative record *de novo* without according deference to the decision of the district court").

 **[28]** While agency action may be overturned as arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem" at issue, Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), a court will not "lightly" reach that conclusion, Islander East Pipeline Co., LLC v. McCarthy, 525 F.3d 141, 151 (2d Cir. 2008) (citing approvingly to Patterson v. Caterpillar, Inc., 70 F.3d 503, 505 (7th Cir. 1995) (stating that court "must be very confident that the decisionmaker overlooked something important")).

 **[29]** Here, DOJ did not overlook something important. As the district court acknowledged, DOJ was aware of the detrimental effects plaintiffs fear from the three challenged conditions. The court also acknowledged that the weight to be given these effects as compared to the conditions' perceived benefits was at least arguable. *See* New York v. Dep't of Justice, 343 F. Supp. 3d at 241. The sole ground on which the district court concluded that DOJ arbitrarily and capriciously "ignored" these detrimental effects in imposing the challenged conditions was its failure to mention such effects in any proffered document. *See* id. (observing that documents "do not reflect that [DOJ] in any way considered whether jurisdictions' adherence to the conditions would undermine trust and cooperation between local communities and government").

 **\*28** In fact, there was no need for DOJ to discuss the relative detriments and benefits of the Certification Condition. That condition identifies a specific statute, 8 U.S.C. § 1373, as an "other applicable Federal law[ ]" for purposes of the statutory compliance certification requirement of 34 U.S.C. § 10153(a)(5)(D). Thus, the sole question for DOJ to decide was whether 8 U.S.C. § 1373 is an applicable law. Having made that decision—which we uphold, *see supra* at ——— – ———nothing in the statute authorized DOJ to excuse a Byrne applicant from certifying its willingness to

comply with an applicable federal law on a finding that the detrimental effects of compliance outweigh the benefits. Indeed, that would be particularly unwarranted here where the legislative history shows that Congress was itself aware of the very detrimental effects raised by plaintiffs when it enacted § 1373. *See supra* at —— (quoting Senator Kennedy's acknowledgment of mayors' concerns that cooperating with immigration authorities could be counterproductive). Thus, DOJ's failure to discuss detrimental effects does not show that it arbitrarily or capriciously imposed the Certification Condition.

As for the Notice and Access Conditions, these apply only to persons in State custody, *i.e.*, persons found guilty beyond a reasonable doubt of charged crimes, or persons for whom there is at least probable cause to think that they committed crimes. Such conditions do not put law-abiding undocumented aliens who have been crime victims or witnesses at risk of removal and, thus, should not dissuade such aliens from reporting crimes or cooperating in their investigation. [38] Thus, it was hardly arbitrary or capricious for DOJ to impose these conditions without discussing detrimental effects that they were unlikely to cause.

Nor are we persuaded by plaintiffs' further argument that the challenged conditions are arbitrary and capricious because DOJ failed to "display awareness that it [was] changing position" and did not show "good reasons for the new policy." Encino Motorcars, LLC v. Navarro, —— U.S. ——, 136 S. Ct. 2117, 2126, 195 L.Ed.2d 382 (2016) (internal quotation marks omitted). DOJ did not change its position; rather, the Attorney General exercised his authority to have Byrne grant applicants satisfy the §§ 10153(a)(4), 10153(a)(5)(C), and 10153(a)(5)(D) requirements in a more specific form. Even if it was necessary to show "good reasons" for this decision, however, that is satisfied here by the 2016 IG Report's findings of a significant, decade-long decline in cooperation between local law enforcement officials and federal immigration authorities, some achieved through policies in tension with, if not actually violative of, 8 U.S.C. § 1373.

## CONCLUSION

To summarize, we conclude as follows:

(1) The Attorney General was statutorily authorized to impose all three challenged conditions on Byrne grant applications.

    **\*29**  a. The Certification Condition (1) is statutorily authorized by 34 U.S.C. § 10153(a)(5)(D)'s requirement that applicants comply with "all other applicable Federal laws," and (2) does not violate the Tenth Amendment's anticommandeering principle;

    b. The Notice Condition is statutorily authorized by 34 U.S.C. § 10153(a)(4)'s reporting requirement, § 10153(a)(5)(C)'s coordination requirement, and § 10155's rule-making authority;

    c. The Access Condition is statutorily authorized by 34 U.S.C. § 10153(a)(5)(C)'s coordination requirement, and § 10155's rule-making authority.

(2) The Attorney General did not overlook important detrimental effects of the challenged conditions so as to make their imposition arbitrary and capricious.

Accordingly,

(1) We REVERSE the district court's award of partial summary judgment to plaintiffs;

(2) We VACATE the district court's mandate ordering defendants to release withheld 2017 Byrne funds to plaintiffs, as well as its injunction barring defendants from imposing the three challenged immigration-related conditions on such grants; and

(3) We REMAND the case to the district court,

    a. with directions that it enter partial summary judgment in favor of defendants on plaintiffs' challenge to the three immigration-related conditions imposed on 2017 Byrne Program grants; and

    b. insofar as there remains pending in the district court plaintiffs' challenge to conditions imposed by defendants on 2018 Byrne Program grants, for further proceedings consistent with this opinion.

**All Citations**

--- F.3d ----, 2020 WL 911417

## Footnotes

1    Defendants have imposed still further conditions on 2018 Byrne grants, which plaintiffs also challenge before the district court. Because no judgment has yet been entered on that part of plaintiffs' case, we do not address plaintiffs' challenge to those conditions on this appeal.

2    The Byrne Program is named for New York City Police Officer Edward Byrne who, at age 22, was shot to death while guarding the home of a Guyanese immigrant cooperating with authorities investigating drug trafficking. The case is well known in this circuit, where five persons were convicted in the Eastern District of New York for their roles in Byrne's murder. Among these was Howard "Pappy" Mason, a drug dealer who, from his New York State prison cell, ordered subordinates to kill a police officer in retaliation for Mason's own incarceration. *See* Joseph P. Fried, *Officer Guarding Drug Witness Is Slain*, N.Y. Times, Feb. 27, 1988, at A1, 34; Leonard Buder, *Trial Is By a Defendant In Police Slaying*, N.Y. Times, Nov. 29, 1989, at B5.

3    *Available at* http://go.usa.gov/xPmkA (last visited Feb. 24, 2020).

4    The APA defines the term "rule" broadly to mean "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing organization, procedure, or practice requirements of an agency ...." 5 U.S.C. § 551(4); *see Safari Club Int'l v. Zinke*, 878 F.3d 316, 332 (D.C. Cir. 2017) (recognizing that APA defines "rule" "very broadly" (internal quotation marks omitted)). At the same time, the APA exempts rules pertaining to grants from the notice-and-comment procedures generally attending federal rule-making. *See* 5 U.S.C. § 553(a)(2); *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1087 (9th Cir. 1989); *cf.* Richard B. Cappalli, *Rights*

*and Remedies Under Federal Grants* 247 (1979) (observing that "a significant number of formula [grant] programs contain no mention of Due Process rights").

5    The Immigration and Naturalization Service, which had been a part of DOJ, *see* 🚩 8 U.S.C. § 1101(a)(34), was disbanded in 2002, *see* 6 U.S.C. § 291, and its duties divided among three services operating within the new cabinet-level Department of Homeland Security: the United States Citizenship and Immigration Service, the Immigration and Customs Enforcement Service, and the Customs and Border Protection Service, *see id.* §§ 111, 211, 251–52, 271.

6    *Available at* https://www.justice.gov/opa/pr/attorney-general-announces-immigration-compliance-requirements-edward-byrne-memorial.

7    As indicated in the text quoted *supra* at ––– – –––, the actual Notice Condition sets no firm 48-hour deadline but, rather, requires notification "as early as practicable."

8    This conference report specifically pertains to 🚩 8 U.S.C. § 1644, a provision of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Pub. L. 104-193), which states that, "notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States." As this court has recognized, 🚩 § 1373, enacted a month after 🚩 § 1644 as part of the Immigration Reform Act, "expands" on the earlier statute insofar as it provides generally that no Federal, State, or local government entity may restrict another government entity from sending to, or receiving from INS, any immigration status information.

     *See* 🔖 *City of New York v. United States*, 179 F.3d 29, 32 (2d Cir. 1999) (rejecting constitutional challenge to both laws). Thus, the conference report pertaining to 🚩 § 1644 is relevant to 🚩 § 1373.

9    Senator Feinstein's comment was made in signaling agreement with a recommendation of the Commission on Immigration Reform, a body created by Congress in 1990 to "evaluate the impact of" changes in federal immigration law. The relevant exchange is as follows:

     Commissioner Teitelbaum: There is a further condition [on recommended immigration impact aid] that was unanimously supported by the Commission ... [and] it should be highlighted, and that is a requirement for cooperation by State and local governments with Federal authorities to enforce the immigration laws of the United States. I don't think the Commission would support the notion of impact aid for States and local governments that declined to cooperate in enforcement of such laws.

     Senator Feinstein: Nor would I, sir, so I agree with you.

     *Immigration Reform Hearings*, 103d Cong. at 26.

10   An immigration detainer is the instrument by which federal authorities formally "advise another law enforcement agency that [they] seek[ ] custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a). Supported by an administrative warrant issued on a showing of probable cause, the detainer generally requests the agency then having custody of the alien to provide federal authorities with advance notice of the alien's intended release date or to detain the alien for a brief time to allow federal authorities to assume custody. *See* U.S. Immigration and Customs Enf't, *Fiscal Year 2017 ICE Enforcement and Removal Operations Report* 7–8 (2017); *see also Hernandez v. United States*, 939 F.3d 191, 200 (2d Cir. 2019).

11   The IG reviewed ten jurisdictions receiving federal grants administered by the DOJ's Office of Justice Programs (*e.g.*, Byrne Program grants) and/or the DOJ's Office of Violence Against Women: "the States of Connecticut and California; City of Chicago, Illinois; Clark County, Nevada; Cook County, Illinois; Miami-Dade County, Florida; Milwaukee County, Wisconsin; Orleans Parish, Louisiana; New York, New York; and Philadelphia, Pennsylvania." App. at 136.

12   To illustrate with some examples, the IG reported that Cook County, Illinois (Chicago), prohibited its on-duty employees from communicating with federal immigration authorities "regarding individuals' incarceration status or release dates." *Id.* at 140 (internal quotation marks omitted). Similarly, Orleans Parish, Louisiana

(New Orleans) prohibited its officials from "provid[ing] information on an inmate's release date" to federal authorities. *Id.* By executive order, Philadelphia employees were prohibited from providing federal authorities with release date information about the subject of an immigration detainer unless that person was incarcerated "for a first or second degree felony involving violence and the detainer is supported by a judicial warrant," and not merely an administrative one. *Id.* at 141 (internal quotation marks omitted).

New York City appears to have placed restrictions on its employees' cooperation with federal immigration authorities as early as 1989. *See* 🔶 *City of New York v. United States*, 179 F.3d at 31 (discussing 1989 executive order prohibiting city officials or employees from communicating individual's immigration status to federal authorities unless (1) required to do so by law, (2) expressly authorized to do so by alien, or (3) alien is suspected of criminal behavior). Then, in a 2003 Executive Order, the City established a "General Confidentiality Policy" summarized by the district court as follows:

> City employees may not disclose an individual's immigration status, except in limited circumstances, such as when the disclosure is authorized by the individual, is required by law, is to another City employee as necessary to fulfill a governmental purpose, pertains to an individual suspected of illegal activity (other than mere status as an undocumented immigrant), or is necessary to investigate or apprehend persons suspected of terrorist or illegal activity (other than mere documented status). Additionally, police officers may not inquire about a person's immigration status unless investigating illegal activity other than mere undocumented status, and may not inquire about the immigration status of crime victims or witnesses at all. Other city employees may not inquire about any person's immigration status unless the inquiry is required by law or is necessary to determine eligibility for or to provide government services.

🚩 *New York v. Dep't of Justice*, 343 F. Supp. 3d at 223 (citations omitted). The IG reported that by law enacted in November 2014, New York City further prohibited its Corrections personnel from communicating inmate release dates to federal immigration authorities unless the inmate is subject to a detainer supported by a judicial warrant. *See* App. at 141.

13    In that respect, DOJ stated,

> 🚩 Section 1373 does not impose on states and localities the affirmative obligation to collect information from private individuals regarding their immigration status, nor does it require that states and localities take specific actions upon obtaining such information. Rather, the statute prohibits government entities and officials from taking action to prohibit or in any way restrict the maintenance or intergovernmental exchange of such information, including through written or unwritten policies or practices.

App. at 151 (internal quotation marks omitted).

14    The validation requirement imposed by DOJ on New York City's 2016 Byrne grant stated as follows:

> The recipient agrees to undertake a review to validate its compliance with 🚩 8 U.S.C. § 1373. If the recipient determines that it is in compliance with 🚩 8 U.S.C. § 1373 at the time of review, then it must submit documentation that contains a validation to that effect and includes an official legal opinion from counsel (including related legal analysis) adequately supporting the validation. If the recipient determines that it is not in compliance with 🚩 8 U.S.C. § 1373 at the time of review, then it must take sufficient and effective steps to bring it into compliance therewith and thereafter submit documentation that details the steps taken, contains a validation that the recipient has come into compliance, and includes an official legal opinion from counsel (including related legal analysis) adequately supporting the validation. Documentation must be submitted ... by June 30, 2017. Failure to comply with this condition could result in the withholding of grant funds, suspension or termination of the grant, ineligibility for future [grants], or other administrative, civil, or criminal penalties as appropriate.

App. at 170, ¶ 53. By letter dated June 27, 2017, the City stated that "[n]otwithstanding [its] position that 🚩 § 1373 is not an applicable federal law ... the City certifies that its laws and policies comply with and operate

within the constitutional bounds of 🚩 § 1373." 2016 Compliance Validation at 2, 🚩 *New York v. Dep't of Justice*, 343 F. Supp. 3d 213 (No. 18-cv-6474), ECF No. 41-1.

15    The relevant statutory text states as follows:

    [t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... in excess of statutory jurisdiction, authority, or limitations, or short of statutory right ....

🔖 5 U.S.C. § 706(2)(C).

16    *See generally* 🔖 *New York v. United States*, 505 U.S. 144, 182, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) ("[S]eparation of powers ... is violated where one branch invades the territory of another."). *But see* 🔖 *Dalton v. Specter*, 511 U.S. 462, 472, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994) (explaining that not every action "in excess of ... statutory authority is *ipso facto* in violation of the Constitution," and distinguishing between "claims of constitutional violations and claims that an official has acted in excess of his statutory authority").

17    Defendants have not claimed 🔖 *Chevron* deference for their own interpretation of the authority conferred by statutes pertaining to Byrne grants and, thus, on this appeal, we do not consider whether any such deference might be warranted. *See* 🔖 *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 845, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *compare* 🔖 *Neustar, Inc. v. FCC*, 857 F.3d 886, 894 (D.C. Cir. 2017) (holding 🔖 *Chevron* deference "forfeited" where not claimed on appeal), *with* 🔖 *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 286 (4th Cir. 2018) (explaining in case where parties assumed 🔖 *Chevron* deference that parties "cannot waive the proper standard of review by failing to argue it" (internal quotation marks omitted)). Rather, we conclude on *de novo* review that the challenged conditions are statutorily authorized.

18    The following statutory sections confer on, or confirm, the Attorney General's authority in this respect:

- 🔖 34 U.S.C. § 10152(c)(1) – Requiring every program funded with a Byrne grant to have a "program assessment component, developed pursuant to guidelines established by the Attorney General" together with the National Institute of Justice.

- 🔖 *Id.* § 10152(d)(2) – Authorizing Attorney General to certify that extraordinary and exigent circumstances warrant using Byrne grant funds for generally prohibited expenditures.

- 🔖 *Id.* § 10152(f) – Affording Attorney General discretion to extend Byrne grants beyond normal four-year period.

- *Id.* § 10153(a) – Requiring Byrne grant applicants to submit application to Attorney General "in such form as the Attorney General may require," including statutorily required certifications and assurances.

- *Id.* § 10153(a)(5)(C) – Requiring certification "in a form acceptable to the Attorney General" that "there has been appropriate coordination with affected agencies."

- *Id.* § 10153(a)(5)(D) – Requiring certification "in a form acceptable to the Attorney General" that "applicant will comply with all provisions of this part and all other applicable Federal laws."

- *Id.* § 10154 - Requiring Attorney General to afford applicant notice and opportunity to correct any application deficiencies before finally disapproving application.

- *Id.* § 10155 – Requiring Attorney General to "issue rules to carry out this part."

19    While matters of "substance" are frequently distinguished from matters of "form," *see, e.g.*, 🔖 *PPL Corp. v. Comm'r of Internal Revenue*, 569 U.S. 329, 340–41, 133 S.Ct. 1897, 185 L.Ed.2d 972 (2013) (distinguishing between form and substance of a tax), a form serves to ensure the communication of required substance.

20    We discuss this notice point further *infra* at —— – ——.

21     *See* *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69–70, 131 S.Ct. 716, 178 L.Ed.2d 603 (2011) (using both dictionary definitions in construing phrase "debtor's *applicable* monthly expense amounts" in provision of Bankruptcy Code (emphasis added) (quoting 11 U.S.C. § 707(b)(2)(A)(ii)(I))).

22     The Third Circuit inferred from the fact that *qualifying* Byrne (and other federal) grant recipients could lose a specified (often small) percentage of their annual distribution if they fail to comply with certain other statutes, that the Attorney General was not statutorily authorized "to withhold *all* of a [Byrne] grantee's funds for *any* reason the Attorney General chooses." *City of Philadelphia v. Attorney Gen.*, 916 F.3d at 286 (emphases in original) (citing 34 U.S.C. § 20927(a) (providing mandatory 10% penalty for failure to comply with Sex Offender Registration and Notification Act); *id.* § 30307(e)(2) (mandating 5% penalty for failure to comply with Prison Rape Elimination Act); *id.* § 40914(b) (withholding up to 4% of funding for failure to meet requirements of National Instant Criminal Background Check System)). That reasoning does not apply here, where the issue is not whether the Attorney General can withhold Byrne funding for any reason from qualifying applicants, but whether he can deny any such funding to an applicant that fails to demonstrate qualification under the Program's statutory requirements, indeed, fails to satisfy them in a "form acceptable to the Attorney General," as Congress has mandated. 34 U.S.C. § 10153(a)(5). To be sure, the form acceptable to the Attorney General must be grounded in the qualifying requirements it serves, but where that is the case, an applicant's failure—or refusal—to satisfy the statutory requirement in that form can result in denial of a Byrne grant. While the Attorney General cannot "finally disapprove" a deficient Byrne grant application "without first affording the applicant reasonable notice of any deficiencies ... and opportunity for correction and reconsideration," *id.* § 10154, if those deficiencies persist after such notice and opportunity, then the Attorney General is authorized to deny the grant in its entirety and to reallocate funds as provided in § 10156(f).

23     The IG's findings, *see supra* at —— – ——, might well be found to demonstrate the "high risk" identified by the Ninth Circuit for imposing "special conditions" on Byrne grants, *see City of Los Angeles v. Barr*, 941 F.3d at 940 (holding that "special conditions," as referenced in § 10102(a)(6), means "unusual" or "extraordinary" conditions for a "high-risk grantee," *i.e.*, a grantee with "a history of noncompliance with grant requirements, financial stability issues, or other factors that suggest[ ] a propensity toward violation of a grant's terms" (internal quotation marks omitted)).

24     Insofar as plaintiffs rely not only on § 10228, but also on the Tenth Amendment to argue that 🚩 § 1373 cannot be an "applicable" law requiring Compliance Certification, we discuss that constitutional point *infra* at —— – ——.

25     As the Supreme Court has long recognized, "as-applied challenges are the basic building blocks of constitutional adjudication," and it is not the court's "traditional institutional role to resolve questions of constitutionality with respect to each potential situation that might develop." *Gonzales v. Carhart*, 550 U.S. 124, 168, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007) (internal quotation marks and alterations omitted); *see Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–95, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (holding that courts should consider constitutional challenge to statute as applied to plaintiff before considering other applications); *Yazoo & Miss. Valley R.R. Co. v. Jackson Vinegar Co.*, 226 U.S. 217, 219–20, 33 S.Ct. 40, 57 L.Ed. 193 (1912) (upholding statute as applied to instant case without speculating as to how it might apply in other circumstances); *accord United States v. Holcombe*, 883 F.3d 12, 17 (2d Cir. 2018) (explaining that where First Amendment rights are not implicated, court considers constitutional challenge "in light of the specific facts of the case at hand" (internal quotation marks omitted)).

    🚩 Section 1373 is not here challenged as constitutionally vague, much less constitutionally vague in a way implicating First Amendment rights, so as to warrant more than as-applied review. *See Farrell v. Burke*, 449 F.3d 470, 496 (2d Cir. 2006) ("The general rule disfavoring facial vagueness challenges does not apply

in the First Amendment context."); *see also* ☐ *United States v. Davis*, —— U.S. ——, 139 S. Ct. 2319, 2323, 204 L.Ed.2d 757 (2019) ("In our constitutional order, a vague law is no law at all.").

26 It has long been the rule in this circuit that a panel decision controls "unless and until ... reversed *en banc* or by the Supreme Court." ☐ *In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144, 154 (2d Cir. 2015) (internal quotation marks omitted).

27 For that same reason, we need not conclusively decide the preemptive effect of 🚩 § 1373. We note only that, insofar as the district court concluded that the statute could claim no preemptive effect because it confers a "purported federal right to transmit information only on government entities and officials," not on private persons, its focus may have been too narrow. *New York v. Dep't of Justice*, 343 F. Supp. 3d at 235 (internal quotation marks and alterations omitted); *see* *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. at 1480 (observing that "Constitution ... confers upon Congress the power to regulate individuals, not States" (internal quotation marks omitted)). As already noted, 🚩 § 1373 is one provision of a larger statute, the INA, which certainly confers rights and places restrictions on large numbers of private persons.

28 The law further requires that federal grant conditions (1) promote the "general welfare," (2) "unambiguously" inform States what is demanded of them, (3) reasonably relate "to the federal interest in particular national projects or programs," and not "induce the States to engage in activities that would themselves be unconstitutional." ☐ *South Dakota v. Dole*, 483 U.S. at 207–08, 210, 107 S.Ct. 2793 (internal quotation marks omitted). None of these requirements is at issue on this appeal. Section 10153(a)(5)(D)'s requirement that Byrne grant applicants certify their willingness to comply with "all ... applicable Federal laws" promotes the respect for law necessary to the general welfare. *See, e.g.*, *City of Los Angeles v. Barr*, 929 F.3d 1163, 1176 (9th Cir. 2019) ("[C]ooperation relating to enforcement of federal immigration law is in pursuit of the general welfare, and meets the low bar of being germane to the federal interest in providing the funding."). Such a certification condition reasonably relates to the Byrne Program, whose focus, after all, is law enforcement. For reasons discussed *supra* at —— – ——, Congress avoids ambiguity by itself stating that § 10153(a)(5)(D) certification must be made as to *all* applicable Federal laws, and then authorizing the Attorney General to require certification in a form that references specifically identified applicable laws. Finally, nothing about § 10153(a)(5)(D) induces unconstitutional conduct by the State-applicants.

29 *See* NEW YORK DIVISION OF THE BUDGET, FY 2017 ENACTED BUDGET FINANCIAL PLAN 69 (May 2016), *available at* https://www.budget.ny.gov/pubs/archive/fy17archive/enactedfy17/FY2017FP.pdf.

30 *See* Press Release, Governor Baker Signs Fiscal Year 2017 Budget (July 8, 2016), *available at* https: www.mass.gov/news/governor-baker-signs-fiscal-year-2017-budget.

31 As this court observed in ☐ *Cuomo v. Barr*, 7 F.3d 17 (2d Cir. 1993), plaintiff "New York houses many illegal aliens in its prison system. As of March 1992, New York held approximately 60,000 prisoners in state correctional facilities, 8% of whom were known to be aliens and an additional 4% of whom were suspected to be aliens. Of this number, 6,096 had been convicted of aggravated felonies, making them subject to deportation." ☐ *Id.* at 18. While the record on appeal does not provide current statistics, there is no reason to suspect a marked decline in these percentages.

32 Because plaintiffs have not sought to distinguish among their grant purposes in defending the challenged injunction and judgment, we have no occasion on this appeal to consider whether Byrne Program funding could be sought for a purpose so unrelated to prosecution, incarceration, or release that the Notice Condition would not be statutorily authorized in those circumstances.

33 While these statutory sections refer to the Attorney General, the removal responsibilities stated therein and in other statutory provisions referenced in this part of the opinion have been transferred to the Secretary of DHS. *See* 6 U.S.C. §§ 251(2), 552(d).

34    States are under no obligation to incarcerate criminal aliens convicted of state felony crimes, but if they do so, they may then request that the federal government either (1) pay "compensation ... as may be appropriate" to the State "with respect to the incarceration" of the alien, or (2) "take the undocumented criminal alien into the custody of the Federal Government and incarcerate the alien." 8 U.S.C. § 1231(i). It appears that, in 2017, plaintiff the State of New York received $13.9 million in such compensation pursuant to the SCAAP program referenced *supra* at ——. *See* Bureau of Justice Assistance, Fiscal Year 2017 SCAAP Award Details, *available at* https://bja.ojp.gov/program/state-criminal-alien-assistance-program-scaap/archives (last visited Feb. 24, 2020) (follow "FY 2017" hyperlink below "SCAAP Awards" subheading).

35    In 1992, New York attempted to sue federal authorities for failing to comply with a predecessor statute requiring them to take into custody, upon release, aliens convicted of aggravated felonies under state as well as federal law. *See Cuomo v. Barr*, 812 F. Supp. 324 (N.D.N.Y. 1993), *appeal dismissed*, 7 F.3d 17 (2d Cir. 1993).

36    Where, as here, the affected agency is federal, the Attorney General can be expected to have particular insights into what coordination is appropriate to establish the relationship and sequence of conduct necessary for a grant applicant and the affected federal agency both to perform their respective duties in an effective and harmonious manner. But even where the affected agency is not federal, the Attorney General's form- and rule-authority may allow him to help parties resolve coordination disputes that surface after the application is made public but before it is approved. *See* 34 U.S.C. § 10153(a)(3)(B).

37    What it does not ensure is that incarcerated aliens will then agree to talk with federal immigration authorities.

38    *See City of Philadelphia v. Attorney Gen.*, 916 F.3d at 282 (citing Philadelphia's rationale for policy limiting employee cooperation with federal immigration authorities: to "foster trust between the immigrant community and law enforcement," which is "critical to reassure law-abiding residents that contact with the City government will not lead to deportation" by federal authorities (internal quotation marks omitted));

*City of Chicago v. Sessions*, 888 F.3d at 279 (observing that "City recognized ... maintenance of public order and safety required the cooperation of witnesses and victims, whether documented or not"); Michael R. Bloomberg, Mayor Michael R. Bloomberg Signs Executive Order 41 Regarding City Services For Immigrants (Sept. 17, 2003) (remarking in public speech that "[w]hen the parents of an immigrant child forego vaccination for fear of being reported to the federal immigration authorities, we all lose .... Likewise, we all suffer when an immigrant is afraid to tell the police that she has been the victim of a sexual assault or domestic violence"), *available at* https://www1.nyc.gov/office-of-the-mayor/news/262-03/mayor-michael-bloomberg-signs-executive-order-41-city-services-immigrants.

---

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.